# In the United States District Court
## for the Southern District of Georgia
## Augusta Division

| | |
|---|---|
| JONES CREEK INVESTORS, LLC; and<br>SAVANNAH RIVERKEEPER, INC.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>COLUMBIA COUNTY, GEORGIA;<br>CSX TRANSPORTATION, INC.;<br>MARSHALL SQUARE, LLC, f/d/b/a<br>NBR INVESTMENTS LLC;<br>D.C. LAWRENCE COMMERCIAL<br>REAL ESTATE, LLC;<br>DONALD LAWRENCE;<br>JOSEPH H. MARSHALL, III;<br>MARSHALL SQUARE PROPERTY<br>OWNER'S ASSOCIATION, INC.;<br>KIMLANDCO, LLC;<br>SOUTHERN SITE DESIGN, INC.;<br>ROBERT F. MULLINS;<br>BRUCE LYONS; and<br>JONES CREEK PARTNERS, LLC,<br><br>    Defendants. | CV 111-174 |

## ORDER

Presently before the Court are Defendants' Motions to Dismiss.  Dkt. Nos. 103, 104.  Upon due consideration, the motions are **DENIED**.

1

# I.   PROCEDURAL BACKGROUND

This is an action seeking damages and injunctive relief for alleged violations of the Clean Water Act, 33 U.S.C. § 1351 et seq. ("CWA"), and for various related federal and state law claims. See Dkt. No. 94.

Plaintiffs filed their Initial Complaint in this matter on October 14, 2011. See Dkt. No. 1. The Initial Complaint consisted of 534 enumerated paragraphs, spanned 174 pages, alleged thirteen (13) counts, and named thirteen (13) Defendants. Id. On October 28, 2011, Plaintiffs filed their First Amended Complaint, which modified rather than supplanted their Initial Complaint. See Dkt. No. 12. In response to Plaintiffs' Initial and First Amended Complaints, many Defendants moved this Court, pursuant Federal Rule of Civil Procedure 12(f), to strike Plaintiffs' pleadings for non-compliance with Rule 8(a)(2)'s "short and plain statement" requirement. See Dkt. Nos. 10, 26.

The Magistrate Judge recommended, and this Court concurred, that Plaintiffs' Initial and First Amended Complaints were impermissibly pled in shotgun fashion. See Dkt. Nos. 63, 90. Consequently, this Court required that Plaintiffs re-plead their complaint. Dkt. No. 90.

2

Plaintiffs' filed their Second Amended Complaint (hereinafter referred to as "Complaint") on March 8, 2012.  See Dkt. No. 94.  Plaintiffs' Complaint is shorter than its predecessors but far from concise.  Plaintiffs name twelve (12) Defendants and list thirteen (13) causes of action.

A. Parties

Plaintiffs are Jones Creek Investors, LLC ("JCI") and Savannah Riverkeeper, Inc. ("Savannah Riverkeeper").

For simplicity, the named Defendants are divided into five (5) groups:

- Columbia County, Georgia (the "County");

- CSX (comprised of CSX Transportation, Inc.);

- the Marshall Defendants (Marshall Square, LLC f/d/b/a NBR Investments, LLC ("Marshall Square, LLC"); D.C. Lawrence Commercial Real Estate, LLC ("D.C. Lawrence"); the Marshall Square Property Owner's Association, Inc. ("Marshall Square POA"); Joseph H. Marshall, III ("Joseph Marshall"); and Donald Lawrence);

3

AO 72A
(Rev. 8/82)

- the Krystal River Defendants (comprised of Kimlandco, LLC; Southern Site Design, LLC; and Robert F. Mullins); and

- the Townhome Defendants (comprised of Jones Creek Partners, LLC, and Bruce Lyons).

On January 15, 2013, this Court granted a consent decree between Plaintiff JCI and the Krystal River Defendants. See Dkt. No. 204. That decree dismissed all claims against the Krystal River Defendants. See Dkt. No. 189-1.

On March 27, 2013, this Court granted a consent decree between Plaintiff JCI and the Townhome Defendants. See Dkt. No. 227. That decree dismissed all claims against the Townhome Defendants. See Dkt. No. 211-1. Accordingly, the only remaining Defendants are the County, CSX, and the five (5) Marshall Defendants.

B. Causes of Action

The causes of action asserted against the various Defendants are as follows:[1]

---

[1] For simplicity, the Court does not name Defendants that have been dismissed from the action.

4

- Count 1:  Violation of the CWA by discharging pollutants from the Columbia County Municipal Separate Storm Sewer System.  Plaintiffs assert this claim against the County.

- Count 2:  Violation of the CWA by discharge of pollutants from upstream properties.  Plaintiff JCI asserts this claim against the County and the Marshall Defendants.

- Count 3:  Violation of the CWA by filling jurisdictional waters and wetlands.  Plaintiff JCI asserts this claim against all Defendants.

- Count 4:  Nuisance by excessive water discharge. Plaintiff JCI asserts this claim against all Marshall Defendants other than Marshall Square POA.

- Count 5:  Injunctive Relief.  Plaintiff JCI asserts this claim against all Marshall Defendants other than Marshall Square POA.

- Count 6:  Nuisance by conditions at CSX Crossing. Plaintiff JCI asserts this claim against CSX.

- Count 7:  Trespass.  Plaintiff JCI asserts this claim against CSX and the Marshall Defendants.

5

- Count 8:  Negligence.  Plaintiff JCI asserts this claim against CSX and the Marshall Defendants.

- Count 9:  Negligence per se.  Plaintiff JCI asserts this claim against CSX and the Marshall Defendants.

- Count 10:  Inverse condemnation.  Plaintiff JCI asserts this claim against the County and CSX.[2]

- Count 11:  Takings.  Plaintiff JCI asserts this claim against the County and CSX.[3]

- Count 12:  Punitive damages.  Plaintiff JCI asserts this claim against CSX and the Marshall Defendants.

- Count 13: Attorney's fees.  Plaintiff JCI asserts this claim against all Defendants.

The moving Defendants seek dismissal of all claims that pertain to them.  See Dkt. Nos. 103, 104.  The Marshall Defendants' Motion to Dismiss implicates Counts 2-5, 7-9, and 12-13.  See Dkt. No. 103.  CSX's Motion to Dismiss implicates Counts 3 and 6-13.  See Dkt. No. 104.  The County has not moved to dismiss the Complaint.

---

[2] Plaintiff brings Count 10 against CSX in the alternative to Counts 6-9.
[3] Plaintiff brings Count 11 in the alternative to Count 10.

6

## II.   FACTUAL BACKGROUND

For purposes of the motions to dismiss, the allegations in Plaintiffs' Complaint are taken as true.  Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1705 (2012).

Plaintiff JCI is a Georgia limited liability company that owns and operates the Jones Creek Golf Course ("Golf Course").[4] Dkt. No. 94, at ¶ 6.  The Golf Course is a nearly 200 acre course located in Evans, Columbia County, Georgia.  Id. ¶ 25. It is more than twenty (20) years old.  Id.  Central features of the Golf Course are Willow Lake and Willow Lake's attendant wetlands and tributary streams, including Jones Creek.[5]  Id. ¶ 26.  Willow Lake is more than six (6) acres at full pool.  Id. It serves as an aesthetic feature of the Golf Course, a recreational resource for the residents, and the sole water supply/source of irrigation for the Golf Course.  Id. ¶¶ 26-27.

---

[4] The other Plaintiff in this action is Savannah Riverkeeper.  Dkt. No. 94 ¶ 7.  Neither pending motion implicates Savannah Riverkeeper's claim (Count 1).
[5] Willow Lake has two (2) primary tributary streams.  Id. ¶ 28. Tributary 1 merges with Jones Creek 300 feet upstream of Willow Lake.  Id.  Jones Creek flows into Willow Lake.  Id.  The other tributary stream originates to the southeast of the Golf Course and flows through the course to Willow Lake. Id. Jones Creek flows from Willow Lake 1.3 miles to the Savannah River.  Id.

JCI's claims arise from damages to the Golf Course, including damages to the Golf Course's water sources.  Id. ¶¶ 38-39.  JCI contends, inter alia, that the moving Defendants caused significant harm to its property through their upstream activities.  More specifically, JCI contends that visual observations, as well as water quality testing, reveal that Willow Lake and its tributaries received and continue to receive excessive amounts of sediment, eroded soils, rock, dirt, sand, sediment-laden storm water, and other debris from the activities of the Marshall Defendants, CSX, and other sources.  Id. ¶ 39.

A. Facts Pertaining to the Marshall Defendants

The Marshall Square Planned Unit Development ("Marshall Square PUD") is a mixed-use, residential and commercial community in Columbia County, Georgia.  It is owned by Defendant Marshall Square, LLC.  Defendants Marshall Square, LLC; D.C. Lawrence; Joseph Marshall; and Donald Lawrence commenced construction and development of Marshall Square PUD on or before

AO 72A
(Rev. 8/82)

July 2008.[6]  Id. ¶ 114.  Land disturbing and development activities continue at Marshall Square PUD.  Id. ¶ 115.

On September 30, 2008, some or all of the Marshall Defendants filed a Notice of Intent for coverage ("NOI") under their GAR100003 permit[7] for construction activities at Marshall Square PUD.[8]  Id. ¶ 97.  The NOI is a state permit that regulates storm water discharges.  On March 3, 2009, some or all of the Marshall Defendants filed a Notice of Termination ("NOT") to terminate coverage under the GAR100003 permit.  Id. ¶ 131.  Plaintiffs allege that the NOT was improperly filed because the Marshall Square PUD was not stabilized, as required by the GAR100003 permit.  Id.  Consequently, the GAR100003 permit

---

[6] Defendant Joseph Marshall is a member and manager of Marshall Square, LLC. Id. ¶ 103; Dkt. No. 103-1, at 2-3.  He directs the company's financial affairs.  Dkt. No. 103-1, at 2-3.  D.C. Lawrence is a real estate company involved in the sale of sub-parcels of Marshall Square PUD.  Id. at 3. Defendant Donald Lawrence is a member and manager of D.C. Lawrence.  Id. Defendant Marshall Square POA is the owner of the large detention pond located in Marshall Square PUD.  Dkt. No. 94 ¶ 99.

[7] GAR100003 is the NPDES General Storm Water construction permit issued by the Georgia Environmental Protection Division.  Dkt. No. 103-1, at 7 n.3.  The permit authorizes storm water discharges from construction activities associated with "Common Developments."  Id.

[8] NBR Investments, LLC is identified as the owner of Marshall Square PUD on the 2008 NOI even though it became Marshall Square, LLC in 2008.  Dkt. No. 94 ¶ 98.  Defendant Joseph Marshall signed the 2008 NOI as a member of "Marshall Square" in the signature space provided for the owner.  Id. ¶ 102.  The NOI identifies Donald Lawrence as the facility contact.  Id.

remains active, and the Marshall Defendants are in continued violation of its provisions.

JCI's claims against the Marshall Defendants pertain to alleged upstream activities which occurred, and continue to occur, at Marshall Square PUD. Marshall Square PUD is allegedly a source of pollutants that currently flow onto JCI's property in violation of federal and state law. Id. ¶ 17. More specifically, the Marshall Defendants allegedly failed to prevent rainwater from leaving Marshall Square PUD, flowing through Jones Creek, and settling in Willow Lake. Additionally, the Marshall Defendants' alleged failure to properly maintain structures in the stream and the Marshall Defendants' clearing, development, and/or construction activities at Marshall Square PUD resulted in dredging and/or filling of navigable U.S. waters. Id. ¶ 251.

B. Facts Pertaining to CSX

CSX owns the CSX Crossing. Id. ¶ 61. CSX Crossing is located upstream from Willow Lake on Tributary 1. Id. ¶ 60. "CSX Crossing" is the embankment and culverts across Tributary 1, including a failed brick culvert and two (2) pipe culverts. Id.

10

On January 26, 2010, the County inspected CSX Crossing. Id. ¶ 62.  The inspection showed that CSX Crossing's brick culvert deteriorated to the point of failure.  Id.  The inspection also showed that portions of the culvert caved in. Id.  The culvert's failure caused the Crossing's embankment to fail.  See id. ¶ 64.  The failure of the brick culvert and embankment resulted in the discharge of significant amounts of sediment and rock from CSX Crossing into Tributary 1. Id.  This discharged sediment and rock ultimately made their way into Jones Creek and Willow Lake.  Id.

CSX's alleged failure to inspect, maintain, or repair CSX Crossing in an adequate or timely manner, caused eroded soil and sediment to discharge into Tributary 1, Jones Creek, and Willow Lake during every post-failure rain event.  Id.  These discharges continued until the culvert was replaced in June 2010.  Id. ¶¶ 64-65.

The brick culvert's failure did not stop the movement of passengers or property by CSX.  Id. ¶ 63.

Pollutant discharges from CSX Crossing to Willow Lake allegedly filled in a significant volume of Willow Lake with sediment.  Id. ¶¶ 182-83.  This fill reduced the lake's water

quality and water storage volume.  Id.  Plaintiffs allege that this fill remains unremediated.  Id.

JCI's claims against CSX are predicated on damages that JCI allegedly sustained as a result of (1) CSX's failure to maintain and/or repair CSX Crossing and its brick culvert and (2) subsequent inadequacies in the Crossing's replacement.

**III. LEGAL STANDARD**

A. Rule 12(b)(1)

Federal courts have limited jurisdiction.  Ishler v. Internal Revenue, 237 F. App'x 394, 395 (11th Cir. 2007) (citing Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005)).  The plaintiff bears the burden of establishing the court's subject matter jurisdiction.  Id. (citation omitted).

A motion to dismiss brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure may challenge the court's subject matter jurisdiction based on the face of the pleadings or the substantive facts of the case.  Morrison v. Amway Corp., 323 F.3d 920, 924 n.5 (11th Cir. 2003).  When addressing a facial challenge, allegations in the plaintiff's complaint are taken as true, and the court determines whether the complaint sufficiently alleges a basis for subject matter jurisdiction.

12

Scarfo v. Ginsberg, 175 F.3d 957, 960 (11th Cir. 1999) (citing Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)).  The complaint may be dismissed on a facial attack only "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1536 n.5 (11th Cir. 1994) (citation omitted).

When addressing a factual challenge, a court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  See Lawrence, 919 F.2d at 1528-29 (quoting Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981)); see also Scarfo, 175 F.3d at 960 ("[M]atters outside the pleadings, such as testimony and affidavits, are considered.") Therefore, the presumption of truthfulness afforded a plaintiff under Federal Rule of Civil Procedure 12(b)(6) does not attach to a factual challenge to the court's subject matter jurisdiction.  See Scarfo, 175 F.3d at 960.

B. Rule 12(b)(6)

In considering a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must "construe[] the complaint in the light most favorable

13

to the plaintiff and accept[] all well-pled facts alleged . . . in the complaint as true." Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint need not contain "detailed factual allegations" but must include enough facts to raise a right to relief above the "speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The complaint must allege "enough facts to state a claim to relief that is plausible on its face" meaning that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Speaker v. U.S. Dep't of Health & Human Servs., 623 F.3d 1371, 1380 (11th Cir. 2010).

## IV.   DISCUSSION

Plaintiffs claim that the Marshall Defendants and CSX violated the CWA and various other federal and state laws. The Marshall Defendants and CSX contend that this Court lacks subject matter jurisdiction over JCI's Clean Water Act claims. In the alternative, the moving Defendants assert that certain claims fail to meet the standard required by Rule 12(b)(6). The moving Defendants' specific challenges are addressed below.

14

A. Counts 2 and 3:  Clean Water Act Claims

   1.   Clean Water Act

   Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity" of the waters of the United States.  33 U.S.C. § 1251(a).  The CWA makes it illegal to introduce pollutants from any point source into the navigable waters of the United States without a permit. Id. §§ 1311(a), 1342.  A "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  Id. § 1362(6). "Navigable waters" are "the waters of the United States, including the territorial seas."  Id. § 1362(7).  "Point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." Id. § 1362(14).

AO 72A
(Rev. 8/82)

Section 301 is the "cornerstone" of the CWA.  That section prohibits all discharges of any pollutant other than those that comply with specified provisions of the CWA.  Id. § 1311; Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs, 486 F.3d 638, 645 (9th Cir. 2007), rev'd and remanded sub nom. on other grounds by Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261 (2009).  CWA § 402 establishes the National Pollutant Discharge Elimination System ("NPDES").  33 U.S.C. § 1342.  The NPDES requires a permit for any discharge of any pollutant from a point source into waters of the United States.  Id.  The NPDES also requires compliance with that permit.  Id.

The Administrator of the Environmental Protection Agency ("EPA") has initial authority to issue NPDES permits.  Id. § 1342(a).  However, the CWA allows each state to establish its own NPDES permit program if that program "meets the standards set forth in the Clean Water Act and is approved by the Administrator of the EPA."  Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC, 548 F.3d 986, 989 (11th Cir. 2008) (citing 33 U.S.C. § 1342(b)).

An entity's failure to comply with the conditions of either the EPA- or state-issued NPDES permit subjects the entity to

16

civil, criminal, or administrative enforcement proceedings and sanctions. Id. (citing 33 U.S.C. § 1319). The EPA and the appropriate state authorities can enforce compliance with state-issued permits. Id. In certain circumstances, a private citizen can sue violators of EPA- or state-issued NPDES permits. Id.; 33 U.S.C. § 1365(a).

Specifically, citizens may file suit "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under [33 U.S.C. Chapter 26] . . . ." 33 U.S.C. § 1365(a). "[C]itizens . . . may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. 49, 59 (1987). Therefore, citizen-plaintiffs must "allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." Id. at 57. Consequently, to establish jurisdiction, citizen-plaintiffs must "make a good-faith allegation of continuous or intermittent violation[s]." Id. at 64; see also Atl. States Legal Found. v. Tyson Foods, Inc., 897 F.2d 1128, 1133 (11th Cir. 1990) ("The Supreme Court stressed that citizen-plaintiffs need not prove their allegations of ongoing noncompliance before jurisdiction

17

attaches under section 505.  Instead, a good faith allegation of violations that continued at the time suit was filed is sufficient for jurisdictional purposes." (emphasis in original) (citation omitted)).  In short, a plaintiff can bring a CWA claim based on "ongoing" violations; however, a plaintiff cannot bring such a claim based on "wholly past" violations.  Gwaltney, 484 U.S. at 64-65.

Courts have struggled to apply the Supreme Court's holding in Gwaltney because the Supreme Court "did not define the point at which an 'ongoing' violation becomes 'wholly past.'"  City of Mountain Park, Ga. v. Lakeside at Ansley, LLC, 560 F. Supp. 2d 1288, 1293 (N.D. Ga. 2008) ("Mountain Park").  This unresolved issue is the thrust of the moving Defendants' contention that this Court lacks subject matter jurisdiction over JCI's CWA claims.

   2.   Count 2:  Upstream Discharge (Against the Marshall
        Defendants)

In Count 2, Plaintiff JCI asserts that the Marshall Defendants violated and continue to violate CWA §§ 301 and 402.  See Dkt. No. 94 ¶¶ 231-44.  JCI's § 301 claim alleges that the Marshall Defendants are unlawfully discharging without a permit.

18

JCI's § 402 claim alleges that the Marshall Defendants are discharging in violation of their permit.  See Dkt. No. 119, at 7.

The Marshall Defendants are allegedly in violation of their GAR100003 permit.  Specifically, JCI contends that the Marshall Defendants violate this permit by failing to maintain erosion control Best Management Practices, violating water quality standards set forth in the permit, and failing to comply with applicable nephelometric turbidity unit ("NTU") levels. Specifically, JCI contends that "[t]he failure to properly implement and maintain structures, land disturbing, development, and/or construction activities at . . . Marshall Square [PUD] has resulted in the past, present and ongoing discharge of pollutants including sediment, sand, rock, dirt, eroded soil, debris, pollutant laden storm water and other substances into waters of the United States."  Dkt. No. 94 ¶ 238.  Thus, JCI alleges that such "activities undertaken at . . . Marshall Square [PUD] have resulted in discharges of pollutants and pollutant laden storm water in violation [the applicable permit and the CWA] for discharges into waters of the United States

either without the required NPDES permit or in violation of the terms of the applicable NPDES permit."  Dkt. No. 94 ¶ 239.[9]

a. Subject Matter Jurisdiction

The Marshall Defendants assert that this Court lacks subject matter jurisdiction.  Specifically, the Defendants assert that Plaintiffs failed to allege "ongoing" violations of the CWA and that such failure prevents Plaintiffs from bringing a citizen-suit.  Dkt. No. 103-1, at 6-11.  The Court disagrees.

Count 2 contains allegations that are sufficient to invoke this Court's subject matter jurisdiction.  In Gwaltney, the Supreme Court "stressed that citizen-plaintiffs need not prove their allegations of ongoing noncompliance before jurisdiction attaches under section 505." Tyson Foods, 897 F.2d at 1133 (emphasis in original).  Rather, "a good faith allegation of violations that continued at the time suit was filed is sufficient for jurisdictional purposes."  Id. (citing Gwaltney, 484 U.S. at 64).  Plaintiffs made good faith allegations of an

_____

[9] JCI provides additional detailed allegations regarding non-compliance with specific portions of the GAR100003 permit.  See Dkt. No. 94 ¶¶ 117, 119-128.

ongoing violation.   Accordingly, the Court has subject matter jurisdiction over Count 2.

The Marshall Defendants contend that any alleged violation of their § 402 Georgia general storm water permit is "wholly past."   Dkt. No. 103-1, at 7.   The Marshall Defendants make two (2) arguments.   First, "none of the Marshall Defendants own or operate any parcels upon which land disturbance or construction activities are occurring."   Id.   Second, the permitee, Marshall Square, LLC, terminated its general storm water permit before the Plaintiffs provided notice of or filed this action.   Id.

### i.   Ownership & Operation

Taking the allegations in Plaintiffs' Complaint as true, the Marshall Defendants are owners and/or operators of land where the alleged CWA violations occurred.   See Dkt. No. 94 ¶ 17.   Specifically, Marshall Square, LLC, was identified as the owner of Marshall Square PUD in 2008.   Id. ¶ 98.   Marshall POA owns the large detention pond at Marshall Square PUD.   Id. ¶ 99.   D.C. Lawrence is identified as the operator of Marshall Square at least through March 2009.   Id. ¶¶ 97, 106.   Joseph Marshall signed the 2008 NOI in the signature space provided for the owner.   Id. ¶ 102.   Donald Lawrence is Marshall Square PUD's facility contact.   Id.   Moreover, in their own briefing,

21

Defendants state that the "Complaint asserts . . . factual allegations against them in their capacities as owners, managers, agents, or contact persons for Marshall Square LLC." Dkt. No. 103-1, at 17.

> ii.   *Terminated Permit*

The Marshall Defendants argue that the GAR100003 permit ceased to be applicable when (1) the permittee, Marshall Square, LLC, filed a NOT with the proper permitting authority and (2) construction activities concluded.  Id. at 8-9.  According to the Marshall Defendants, once a permit is terminated and construction activities cease, there is no longer an NPDES permit covering the construction activities.  Id. at 9.

The Marshall Defendants' argument that their GAR100003 permit is inactive contradicts the facts asserted in Plaintiffs' Complaint.  Plaintiffs acknowledge that Marshall Square, LLC, filed a certified NOT of its GAR100003 permit more than two (2) years before Plaintiffs filed their Notice of Intent to sue. See Dkt. No. 94 ¶¶ 3, 131.  However, Plaintiffs contend that the NOT was improperly filed because the site was not fully stabilized as required by the permit.  Id. ¶ 131.  Specifically, JCI contends that a NOT for a GAR100003 permit may be properly submitted only "after all construction activities have ceased

22

for a minimum of 90 days, final stabilization has been implemented by the primary permittee and by all secondary permittee(s) . . . and the site is in compliance with [the GAR100003 permit]." Dkt. No. 119, at 10 (citing GAR100003, Part VI(A)).

Plaintiffs' allegation of non-compliance with the requirements to file for a NOT necessarily implies that the permit was not terminated. Consequently, Plaintiffs' Complaint sets forth sufficient factual information to support their claim that the GAR100003 permit remains active.

The Marshall Defendants' argument that construction activities ended is similarly unpersuasive. First, the argument is contrary to the allegations in Plaintiffs' Complaint. See Dkt. No. 94 ¶¶ 115, 235. Second, the argument fails to consider Plaintiffs' allegation that the Marshall Defendants continue to violate the active GAR100003 permit. See Id. ¶¶ 117, 119-128. The Marshall Defendants submit that the "Plaintiffs cannot dispute that the construction and land disturbance activities covered by the permit had ceased by [March 3, 2009], despite their claim that '[l]and disturbing and development activities are ongoing at Marshall Square.'" Dkt. No. 103, at 10 (citing Dkt. No. 94 ¶ 115). The infirmity of the Marshall Defendants'

23

argument is—as the Marshall Defendants acknowledge through citation to Plaintiffs' Complaint—that Plaintiffs can, and have, alleged an ongoing violation of an active GAR100003 permit.

The Court is obligated to accept as true the well-pled allegations set forth in Plaintiffs' Complaint.  Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1705 (2012).  Thus, the Court must accept that the Marshall Defendants failed to properly terminate the GAR100003 permit.[10]  The Court must also accept that the Marshall Defendants have and continue to violate the active GAR100003 permit.  Dkt. No. 94 ¶¶ 117, 119-128. Taking Plaintiffs' allegations as true, Plaintiffs Complaint makes a "good-faith allegation of continuous or intermittent violation" of the CWA by the Marshall Defendants.  Gwaltney, 484 U.S. at 64.  Thus, this Court has subject matter jurisdiction over Count 2.  Consequently, the Marshall Defendants' motion to

---

[10] The Marshall Defendants opine that "the ability of a permittee to terminate the coverage of a construction permit would be rendered meaningless if any party could undermine any Notice of Termination by pleading years later that the certified, filed Notice of Termination was inadequate."  Dkt. No. 103-1, at 10.  The Court acknowledges the import of this argument but notes that various other mechanisms exist to prevent bad faith allegations in this context.

24

dismiss Count 2 for lack of subject matter jurisdiction is **DENIED**.

      b. Notice of Intent to Sue

The Marshall Defendants contend that, to the extent that Count 2 alleges that the Marshall Defendants violated § 301, such claim should be dismissed.  Specifically, the Defendants argue that the Court lacks subject matter jurisdiction because Plaintiffs failed to comply with the CWA's notice requirements. Dkt. No. 103-1, at 14.

        *i.   Legal Standard*

CWA § 505 dictates that no action may be commenced prior to sixty days (60) after the plaintiff has given notice of the alleged violation to any alleged violator of the standard, limitation, or order.  33 U.S.C. § 1365(b)(1)(A).  The EPA has provided further instruction regarding the contents of such notice:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and

AO 72A
(Rev. 8/82)

the full name, address, and telephone number of the
person giving notice.

40 C.F.R. § 135.3(a).  The Eleventh Circuit has held that notice
under the CWA "is a mandatory condition precedent to the filing
of a citizen suit under the Clean Water Act.  If a plaintiff
fails to comply with this notice requirement . . . , the
district court is required to dismiss the action."  Nat'l Envtl.
Found. v. ABC Rail Corp., 926 F.2d 1096, 1097-98 (11th Cir.
1991).  The notice requirement is "strictly construed to give
the alleged violator the opportunity to correct the problem
before a lawsuit is filed."  Nat'l Parks & Conservation Ass'n,
Inc. v. Tenn. Valley Auth., 502 F.3d 1316, 1329 (11th Cir.
2007).

     *ii.  Application*

The Marshall Defendants admit that they received a notice
letter from Plaintiffs more than sixty (60) days prior to the
filing of the original Complaint.  However, they contest the
sufficiency of the notice.  Specifically, the Marshall
Defendants assert that they were not properly notified of a
§ 301 claim.  In particular, the Marshal Defendants argue that
Plaintiffs' May 16, 2011, and December 6, 2011, Notices of
Intent to sue only allege that the Marshall Defendants
discharged in violation of a permit pursuant to § 402.  The

26

Defendants contend that the notices failed to provide notice of a potential § 301 violation.  Dkt. No. 103-1, at 15-16.  Upon examination of the actual notice given, Defendants' argument fails.

In pertinent part, Plaintiffs' May 16, 2011, Notice of Intent to Sue letter stated "[t]he Marshall Square Defendants have violated and continue to violate the Clean Water Act §§ 301, 402, and 404 by discharging pollutants from the Marshall Square Site into jurisdictional waters."  Dkt. No. 94-5, at 5. The letter further stated that "[u]nder CWA § 301, 33 U.S.C. § 1311, the discharge of any pollutant into waters of the United States from a point source without a permit or while violating a NPDES permit is illegal."  Id.

The purpose of the notice requirement is "to give [an alleged violator] an opportunity to bring itself into complete compliance with the [CWA] and thus likewise render unnecessary a citizen suit."  Gwaltney, 484 U.S. at 60.  Plaintiffs' letter did just that.  Specifically, Plaintiffs put the Marshall Defendants on notice that that their conduct violated § 301.

The Marshall Defendants further argue that no factual allegations in the letter are tied to the allegation that they had violated § 301 by discharging without a permit.  Dkt. No.

27

103-1, at 16.  The discharging activities are the same, however, whether § 301 or § 402 applies.  That is, the only practical difference in this case is that, if the permit was properly terminated, Plaintiffs allege a § 301 claim, and if the permit was not properly terminated, Plaintiffs allege a § 402 claim. The nature of the allegedly unlawful discharge remains the same for either claim.

Plaintiffs' notification of this alleged unlawful discharge in the alternative (e.g., the discharge violated either § 301 or § 402) does not change the outcome.  In analyzing a similar notice of intent to sue letter, a District Court concluded that providing notice in the alternative in this specific context was adequate.  Purvis v. Douglasville Dev., LLC, No. 1:06CV0415 WSD, 2006 WL 3709610, at *4 (N.D. Ga. Nov. 9, 2006).  This Court agrees with that court's reasoning.  Specifically, that court stated:

> The allegation, although disjunctive, put Defendant on
> notice that it should investigate whether the level of
> pollutants—specifically sediment, sand, rock, and
> dirt—being discharged by its activities around the
> Tributary . . . violated a permit requirement or
> exceeded a permit in Defendant's possession.  This
> portion of the notice inform[ed] Defendant about two
> specific, if alternative, wrongs it may be committing
> based on the same alleged conduct, [gave] Defendant

28

sufficient notice to identify the pertinent aspects of the alleged violation, and is thus sufficient.

Id.  A similar outcome is warranted here.  Consequently, the Marshall Defendants' motion to dismiss Count 2 for insufficient notice is **DENIED.**

   3.   Count 3:  Filling Jurisdictional Waters (Against CSX and the Marshall Defendants)

In Count 3, Plaintiffs allege that the moving Defendants violated CWA § 404 by dredging, filling, or altering the natural and/or existing course and flow of jurisdictional waters without a permit to do so or in violation of an applicable permit.  Dkt. No. 94 ¶ 247.  Plaintiffs further allege that the moving Defendants violated CWA § 404 by allowing such conditions to remain unremediated.  Id.  JCI also contends that CSX's failure to correct or ameliorate culvert and embankment failures and CSX's subsequent construction activities at CSX Crossing resulted in the discharge of dredged or fill material into navigable U.S. waters.  Id. ¶ 250.  Likewise, JCI contends that the Marshall Defendants' failure to properly maintain structures in the stream, and their clearing, development, and/or construction activities resulted in the discharge of dredged or fill material into navigable U.S. waters.  Id. ¶ 251.  Unlike

29

CSX, the Marshall Defendants are allegedly continuing to fill jurisdictional waters without a § 404 permit.  Id. ¶¶ 247-55.

CWA § 505(a)(1) authorizes citizens to sue any person alleged to be in violation of an "effluent standard or limitation" as defined in CWA § 505(f).  CWA § 404 gives the Army Corp of Engineers authority to permit the discharge of "dredged" or "fill" material into jurisdictional waters.  JCI alleges that CSX violated § 404 when it failed to obtain authorization from the Army Corps of Engineers (1) before the failed culvert was repaired and (2) when CSX replaced the failed culvert.

CSX contends that this allegation is deficient under the Supreme Court's holding in Gwaltney because both the omission and the act occurred wholly in the past.  Dkt. No. 104, at 5.  That is, the alleged violations occurred not later than June 2010, more than one (1) year before Plaintiffs' filed this suit.  Id.  In response, JCI contends that dismissal is not warranted because the Complaint makes a good faith allegation of CSX's ongoing violations of the CWA due to the continuing presence of its discharged pollutants, including eroded soils and sediment, in jurisdictional waters.  Dkt. No. 111, at 6-7.

30

The Marshall Defendants also argue that Count 3 alleges "wholly past" violations of the CWA. Dkt. No. 103-1, at 6-7. In response, JCI provides the same argument that it does with respect to CSX. Namely, JCI contends that the presence of unlawful unremediated dredged and fill material constitutes a § 404 violation. See, e.g., Dkt. No. 94 ¶ 255 ("[T]he maintenance of failed structures, land disturbance, construction and/or other development activities at . . . Marshall Square [PUD] have resulted, and will continue to result, in the discharge of dredged or fill material into navigable waters of the United States . . . yet no dredge and fill permit has been secured . . . as required under Section 404 of the Clean Water Act.").

The Eleventh Circuit has not examined the issue before the Court. That is, the Eleventh Circuit has not answered the question: Under what circumstances, if any, does a continuing violation of the CWA occur when the conduct that gave rise to the violation has ceased but the violation's effects continue? However, district courts within the Eleventh Circuit have answered this question by analyzing and applying the high court's holding in Gwaltney.

In support of their respective positions, each party presented the Court with non-binding case law that supports

31

their respective arguments.  After careful consideration, the Court finds JCI's authority more persuasive and, therefore, determines that Count 3 is not subject to dismissal.

JCI submits that the overwhelming majority of decisions examining this issue have held that the continued presence of dredged or fill material constitutes an ongoing violation for the purposes of the CWA.  JCI's characterization is ambitious. However, there is considerable support for its position.  See, e.g., Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich, 820 F. Supp. 2d 859, 895 (N.D. Ind. 2011) ("The Court finds the weight of authority . . . to be persuasive that the continued presence of fill material in the waterway constitutes a continuing violation." (citation omitted)); Stepniak v. United Materials, LLC, No. 03-CV-569A, 2009 WL 3077888, at *4 (W.D.N.Y. Sept. 24, 2009) ("The weight of authority supports plaintiffs' position that the continued presence of fill material constitutes a continuing violation." (citation omitted)); Swinomish Indian Tribal Cmty. v. Skagit Cnty. Dike Dist. No. 22, 618 F. Supp. 2d 1262, 1266 (W.D. Wash. 2008) ("The ongoing presence of fill materials without a permit represents a continuing violation of the CWA."); Mountain Park, 560 F. Supp. 2d at 1296 (holding that the continuing presence of illegally

32

discharged fill material can constitute an "ongoing violation"
under Gwaltney); N.C. Wildlife Fed'n v. Woodbury, No. 87-584-
CIV-5, 1989 WL 106517, at *2 (E.D.N.C. Apr. 25, 1989) (holding
that the failure to remove unlawful fill material constitutes a
continuing violation of the CWA sufficient to confer federal
jurisdiction under the CWA's citizen-suit provision).  Cf.
Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc., No.
608CV064, 2009 WL 2390851, at *8 (S.D. Ga. Aug. 4, 2009)
(finding that an alleged CWA § 404 violation continues so long
as the fill remains because the violation is "continuing in
nature.").

In contrast, the moving Defendants ask the Court to follow
their interpretation of the Second Circuit's decision in Conn.
Coastal Fisherman's Ass'n v. Remington Arms Co., Inc.  989 F.2d
1305, 1313 (2d Cir. 1993) (finding that "[t]he present violation
requirement of the [CWA] would be completely undermined if a
violation included the mere decomposition of pollutants").  See
also Wilson v. Amoco Corp., 33 F. Supp. 2d 969, 975 (D. Wyo.
1998) (determining that "migration of residual contamination
from previous releases does not constitute an ongoing
discharge").

33

The Northern District of Georgia extensively analyzed this issue in Mountain Park.  There, the court faced the difficult problem that this Court now faces:  determining when a violation becomes "wholly past."   The court in Mountain Park noted that Gwaltney "did not define the point at which an 'ongoing' violation becomes 'wholly past.'"  Mountain Park, 560 F. Supp. 2d at 1293.  The court also noted that "[a]nswering this question is especially difficult in cases . . . where the conduct that gave rise to the violation has ceased, but the effects continue."  Id.  In analyzing relevant case law, the court ultimately surmised that cases involving fill materials are consistently treated differently than those involving other pollutants.  That is,

> The majority of cases dealing with fill materials appear to adopt the approach taken in Woodbury of deeming the pollution "ongoing" as long as the polluting fill material remains in the water .  . . . . In contrast, most of the decisions taking the stricter interpretation of "wholly past" violations employed in Remington have involved pollutants other than fill materials.

Id. at 1296 (citations omitted).

The court reasoned that the distinction between fill material and other pollutants was important because fill materials "do not significantly dissipate or dissolve over

34

time." Id. Rather, fill materials "stay intact over time and thus continue to have roughly the same net polluting effect years or even decades after the time of their deposit." Id.

Furthermore, the court in Mountain Park found that the distinction between fill materials that do not dissipate or dissolve and other pollutants was supported by Justice Scalia's concurrence in Gwaltney. More specifically, the court noted Justice Scalia's determination that a polluter remains "in violation" of the CWA "so long as it has not put in place remedial measures that clearly eliminate the cause of the violation." Id. (citing Gwaltney, 484 U.S. at 69 (Scalia, J. concurring)). The court, thus, determined that "the continuing presence of illegally discharged fill material can constitute an 'ongoing violation' under Gwaltney." Id. at 1297.

After considering the various authorities on the issue, this Court holds that the continued presence of illegally discharged fill material in U.S. jurisdictional waters constitutes a continuing violation. Specifically, the alleged continued presence of unlawful fill materials within Willow Lake constitutes an ongoing violation of § 404 of the CWA. Thus, Plaintiffs have presented a "good-faith allegation of continuous or intermittent violation" of the CWA by the moving Defendants.

35

Gwaltney, 484 U.S. at 64.  As such, this Court has subject matter jurisdiction over Count 3.  Consequently, the moving Defendants' motion to dismiss Count 3 for lack of subject matter jurisdiction is **DENIED.**

    4.   Counts 2 and 3:  CWA Violations (Against Marshall
           Defendants other than Marshall Square, LLC)

    The Marshall Defendants assert that Plaintiffs' CWA claims (Counts 2 and 3) against D.C. Lawrence, Marshall Square POA, Joseph Marshall, and Donald Lawrence should be dismissed. Defendants' argument is as follows:  Marshall Square, LLC, is the permitee of the GAR100003 permit.  As permitee, Marshall Square, LLC, is the only person responsible for complying with the conditions of the GAR100003 permit.  Dkt. No. 103-1, at 21-22.  More specifically, the other Marshall Defendants cannot be held liable for violations of the GAR100003 permit because the permit was not issued to them individually.  Id. at 21.

    In response, Plaintiffs contend that D.C. Lawrence can be held liable because it operated the Marshall Square PUD, Marshall Square POA can be held liable because it owns the large detention pond where discharges allegedly occurred, and Joseph

36

Marshall and Donald Lawrence can be held liable because they are responsible corporate officers.  Dkt. No. 119, at 22-25.

a. Legal Standard

CWA § 505 permits a citizen-suit against "any person . . . who is alleged to be in violation of . . . an effluent standard or limitation" under the CWA.  33 U.S.C. § 1365.  "Person" is defined as "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."  Id. § 1362(5).

The Eleventh Circuit has not addressed whether the term "person" includes corporate officers in the context of CWA citizen-suits.  Franklin v. Birmingham Hide & Tallow Co., No. CV 98-BU-0259-S, 1999 U.S. Dist. LEXIS 22489, at *43 (N.D. Ala. Apr. 21, 1999).  However, several courts have addressed the issue.  Those courts determined that corporate officers can be held liable in civil suits brought under 33 U.S.C. § 1365.  See Kovich, 820 F. Supp. 2d 859, 890-92 (N.D. Ind. 2011) (collecting cases and finding "that the responsible corporate officer doctrine extends to civil violations under the Clean Water Act"); Draper v. H. Roberts Family LLC, No. 1:06-CV-3057-CC, at *24 (N.D. Ga. March 30, 2009) (unpublished) (finding that

37

AO 72A
(Rev. 8/82)

citizens can be held individually liable in CWA citizen-suit actions); Waterkeepers N. Cal. v. AG Indus. Mfg., Inc., No. CIV-S-00-1967MCEPAN, 2005 WL 2001037, at *13 (E.D. Cal. Aug. 19, 2005) (denying individual defendant's summary judgment motion in CWA action because "the responsible corporate officer doctrine has been applied to both criminal and civil cases").

The Marshall Defendants' argument is similar to the argument of the defendant in Franklin. There, the defendant argued that he could not be personally liable for his company's violation of a NPDES permit because the criminal penalties provision of the CWA "specifically states that the term 'person' shall mean, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer" and the CWA's civil penalties provision did not contain such language. Franklin, 1999 U.S. Dist. LEXIS 22489, at *45. Therefore, the defendant argued, a responsible corporate officer can only be held criminally—not civilly—liable. Id. The Franklin court rejected this argument. Specifically, the court stated that

> [A] number of courts have found that corporate officers who are responsible for violations of public health statutes, including the CWA, may be both civilly and criminally liable in their in their individual capacity for such violations, not

38

withstanding that the wrongful actions were undertaken on behalf of a corporate entity.

Id. at *43-44 (citing United States v. Gulf Park Water Co., 972 F. Supp. 1056 (S.D. Miss. 1997); United States v. Mac's Muffler Shop, Inc., No. Civ. A. No. C85-138R, 1986 WL 15443 (N.D. Ga. Nov. 4, 1986)).

b. Application

This Court agrees with the preceding case law. Specifically, this Court finds that corporate officers can be held liable in civil suits brought under 33 U.S.C. § 1365. Consequently, the Court finds that the permitee is not the only person responsible for non-compliance with the permit.  See Franklin, 1999 U.S. Dist. LEXIS 22489.

First, dismissal of the CWA claims against D.C. Lawrence is not warranted because D.C. Lawrence was the operator of Marshall Square PUD.  See Dkt. No. 94 ¶ 97; see also Beartooth Alliance v. Crown Butte Mines, 904 F. Supp. 1168, 1175 (D. Mont. 1995) (finding that, under the CWA, "[a]n entity is an operator of a facility where it has the power or capacity to (i) make timely discovery of discharges, (ii) direct the activities of persons who control the mechanisms causing the pollution, and (iii) prevent and abate damage") (citing Apex Oil Co. v. United

39

States, 530 F.3d 1291, 1293 (8th Cir. 1976)).  Thus, taking Plaintiffs' facts as true, Defendant D.C. Lawrence was a responsible corporate officer during the alleged CWA violations. Consequently, D.C. Lawrence can be held civilly responsible for alleged violations of the GAR100003 permit.

Second, dismissal of the CWA claims against Marshall Square POA is not warranted because Marshall Square POA owns the large detention pond located in Marshall Square PUD.  This pond is located in Marshall Square PUD.  Dkt. No. 94 ¶ 99.  It serves the Marshall Square site.  Id.  Plaintiffs allege that (1) the detention pond was inadequately planned, built, and maintained, (2) the slopes above the large detention pond failed, (3) this failure resulted in gully erosion on the pond's slopes, and (4) the slope failure and resultant gully erosion prevents retention of turbid water by the detention pond and results in discharge from Marshall Square PUD into Tributary 1.  Id. ¶ 124. From Tributary 1, storm water runoff and discharge flows into Jones Creek and, subsequently, into Willow Lake.  Id. ¶ 116. Consequently, the detention pond allegedly discharges debris in violation of the CWA.  As owner of the detention pond, Marshall Square POA can be held civilly responsible for alleged violations of the GAR100003 permit.

AO 72A
(Rev. 8/82)

Third, dismissal of the CWA claims against Defendants Joseph Marshall and Donald Lawrence is not warranted. Plaintiffs' Complaint creates a plausible inference that these individual Defendants may be personally liable as responsible corporate officers for the alleged CWA violations.  According to Plaintiffs' Complaint, both individuals were responsible for ensuring CWA compliance, were privy to CWA violations, and failed to remedy those violations.  Furthermore, both Joseph Marshall and Donald Lawrence were allegedly involved with the activities at Marshall Square PUD that resulted in CWA violations.  In particular, Joseph Marshall was the owner and manager of Marshall Square PUD.  Id. ¶¶ 102-03.  Donald Lawrence was the owner, developer, and contact on 2007 site plans for Marshall Square PUD, including the site's Storm Drainage Plan and the site's Erosion and Sedimentation Pollution Control Plan. Id. ¶ 100.  These facts create a plausible inference that Defendants Joseph Marshall and Donald Lawrence were responsible corporate officers during the alleged CWA violations. Consequently, those individuals can be held civilly responsible for alleged violations of the GAR100003 permit.

Corporate officers can be held liable in civil suits brought under 33 U.S.C. § 1365.  The Complaint creates a

41

plausible inference that the individually named Defendants violated the CWA in their capacities as corporate officers. Consequently, the Marshall Defendants' motion to dismiss Plaintiffs' CWA claims (Counts 2 and 3) against D.C. Lawrence, Marshall Square POA, Joseph Marshall, and Donald Lawrence is **DENIED.**

B. Count 11:  Takings Claim against CSX

In Count 11, Plaintiffs' allege that CSX's actions and omissions resulted in an unconstitutional taking of Plaintiff's property.  Id. ¶¶ 326-59.  Plaintiffs also bring their claim pursuant to 42 U.S.C. § 1983.  Id. ¶¶ 350-51.  Plaintiffs bring Count 11 in the alternative to Count 10 (JCI's state inverse condemnation claim).  Id. ¶ 326.

CSX asserts that Count 11 is not ripe and should be dismissed.  Dkt. No. 104, at 13-14.  Count 11 should not be dismissed.

1.  Legal Standard

The parties agree that "a federal takings claim does not ripen until just compensation is denied through the procedures the state has provided unless those procedures are unavailable

42

or inadequate." Dkt. No. 111, at 16 (citing Williamson Cnty.

Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S.

172 (1985)). Thus, a would-be litigant cannot claim that it has

been denied "just compensation until [it has] exhausted any such

avenues of relief." Fields v. Sarasota Manatee Airport Auth.,

953 F.2d 1299, 1303 (11th Cir. 1992) (quoting Williamson Cnty.,

473 U.S. at 186). Consequently, "if a State provides an

adequate procedure for seeking just compensation, the property

owner cannot claim a violation of the Just Compensation Clause

until it has used the procedure and been denied just

compensation." Williamson Cnty., 473 U.S. at 195.

The Georgia Constitution provides that "private property

shall not be taken or damaged for public purposes without just

and adequate compensation being first paid." Ga. Const. art. I,

§ III, ¶ I(a). The government violates this constitutional

provision when it "has not directly proceeded to appropriate

title or possession of the property but has destroyed its actual

usefulness and value by reason of the de facto exercise of the

power of eminent domain." Fla. E. Coast Props., Inc. v. Metro.

Dade Cnty., 572 F.2d 1108, 1111 (5th Cir. 1978). A plaintiff

properly seeks redress for such a violation by asserting an

inverse condemnation claim. See id.; see also United States v.

43

Clarke, 445 U.S. 253, 257 (1980) (defining an inverse condemnation claim as "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency" (emphasis omitted)).

2.   Application

Georgia law specifically provides property owners with a claim for inverse condemnation.  See Benton v. Savannah Airport Comm'n, 555 S.E.2d 110, 111 (Ga. Ct. App. 2001) ("The State of Georgia provides property owners an adequate procedure for seeking just compensation in the form of an inverse condemnation action." (footnote omitted)).  Therefore, in Georgia, an adequate procedure exists for property owners to obtain just compensation for a taking.

Although JCI has not utilized Georgia's procedure for obtaining just compensation for a taking, JCI is presently utilizing that procedure.  In Count 10, JCI asserts an inverse condemnation claim.  JCI brings Count 11 in the alternative to Count 10.  That is, Count 11 becomes ripe, if at all, only after Count 10 is resolved.

44

Judicial economy supports JCI's alternative pleading.  See San Remo Hotel, L.P. v. City & Cnty. of S.F., Cal., 545 U.S. 323, 346 (2005) ("Reading Williamson County to preclude plaintiffs from raising [state and federal takings] claims in the alternative would erroneously . . . require[e] property owners to resort to piecemeal litigation or otherwise unfair procedures." (internal citations and quotation marks omitted)).

CSX argues that a plaintiff can only assert such claims in the alternative in state court.  See Dkt. No. 123, at 15-18 (citing San Remo for the proposition that "[t]he requirement [to] . . . seek compensation through the procedures the State has provided . . . does not preclude state courts from hearing" a plaintiff's state law and federal constitutional claims in the alternative (emphasis added)).  CSX further argues that federal courts "are not in the same position [as state courts] if there is no other basis for federal jurisdiction."  Id. at 16 (emphasis added).  However, this Court has original jurisdiction over Plaintiffs' CWA claims.  See supra Part IV.A. Consequently, the Court can exercise supplemental jurisdiction over Plaintiffs' related claims, including Count 10.  See 28 U.S.C. § 1367.  With jurisdiction over Count 10, the Court can and will—in the interest of judicial economy and consistent

45

with the reasoning of the Supreme Court in San Remo—retain jurisdiction over Count 11 in the alternative.  Because Plaintiffs pled Count 11 in the alternative to Count 10, Count 11 will ripen, if at all, after Count 10 is resolved. Consequently, CSX's motion to dismiss Count 11 is **DENIED**.

C. Preemption of State Law Claims Against CSX

CSX contends that the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10101 et seq., expressly preempts JCI's state law tort claims.  At this stage in the proceedings, the Court disagrees.

1.   Legal Standard

In passing the ICCTA, Congress expressly preempted state law regulation of rail transportation.  Congress granted the Surface Transportation Board ("STB") exclusive jurisdiction over rail transportation, rail carriers, and rail facilities.  49 U.S.C. § 10501(a)(2)(b).  Specifically, the ICCTA provides the STB with exclusive jurisdiction over:

> (1)  transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

46

    (2)   the construction, acquisition, operation,
            abandonment, or discontinuance of spur,
            industrial, team, switching, or side tracks, or
            facilities, even if the tracks are located, or
            intended to be located, entirely in one State . .
            . .

49 U.S.C. § 10501(a)(2)(b) (emphasis added).

"Transportation" is defined as

    (A)   a locomotive, car, vehicle, vessel, warehouse,
            wharf, pier, dock, yard, <u>property</u>, facility,
            instrumentality, <u>or equipment of any kind related</u>
            <u>to the movement of passengers or property, or</u>
            <u>both, by rail</u>, regardless of ownership or an
            agreement concerning use; and

    (B)   <u>services related to that movement</u>, including
            receipt, delivery, elevation, transfer in
            transit, refrigeration, icing, ventilation,
            storage, handling, and interchange of passengers
            and property[.]

<u>Id.</u> § 10102(9) (emphasis added).

"Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation, . . . while permitting the continued application of laws having a more remote or incidental effect on rail transportation." <u>Fla. E. Coast Ry. Co. v. City of W. Palm Beach</u>, 266 F.3d 1324, 1331 (11th Cir. 2001) (editorial marks removed).

47

2.   Application

In their pre-suit demand letter, Plaintiffs' noted that, in June 2010, they "observed a significant dip in the railroad tracks at the [CSX Crossing] apparently due to the loss of supporting soils." Dkt. No. 94-1, at 3. CSX contends that this letter establishes that the embankment and culverts supporting the rail track constitute "transportation" as defined by the ICCTA. Specifically, CSX asserts that the embankment and culverts are "transportation" because they are "property . . . or equipment . . . related to the movement of passengers or property, or both, by rail" and/or "services related to that movement." 49 U.S.C. §§ 10102(9)(A)-(B).

It is reasonable to infer that the activities discussed in this pre-suit demand letter relate to the movement of passengers or property. However, that is not the only plausible inference. Stated differently, while it may turn out that this "significant dip" brings JCI's claims within purview of the ICCTA exemption, such an outcome is not certain based on Plaintiffs' Complaint.

AO 72A
(Rev. 8/82)

In support of its position, CSX relies on a Texas appellate court decision that involved railroad culverts.[11]  See Dkt. No. 104, at 16 (citing A&W Props. v. Kan. City. S. Ry. Co., 200 S.W. 3d 342, 346 (Tex. App. Dallas 2006)).  In A&W Properties, the Texas Court of Appeals found that the plaintiff's claim was preempted under the ICCTA.  The court reasoned that:

> [The plaintiff] focuses on the culvert that runs below the bridge; the Railroad focuses on the bridge running across the culvert.  The summary judgment evidence includes a picture of the railroad crossing at issue. It is self-evident that any effort to widen the culvert would necessitate making alterations to the bridge on which the tracks cross the culvert.  The culvert and bridge are inextricably connected, and we reject semantic efforts to characterize [the plaintiff's] claims as involving one structure but not the other.

A&W Props., 200 S.W. 3d at 346 n.5.  In contrast to A&W Properties, the Court cannot say at this stage what effects the embankments and culverts had on the actual railroad. More importantly, the Court cannot say whether the embankments and culverts are "related to the movement of

_____

[11] CSX also relies on a Missouri appellate court decision.  See Dkt. No. 186 (citing Vill. of Big Lake v. BNSF Ry. Co., Inc., 382 S.W.3d 125 (Mo. Ct. App. 2012)).  However, that case involves a direct governmental attempt to regulate the construction and operation of a rail line by requiring local permitting and pre-clearance.  No such permitting and preclearance is at issue in this case.

passengers or property." 49 U.S.C. § 10102(9)(A).
Evidence may reveal that the culverts and embankment are
"inextricably connected" to the rail. However, at this
point, all reasonable inferences must be construed in
Plaintiffs' favor.

Plaintiffs allege that its "state law claims do not
regulate, manage, govern, or even incidentally affect rail
transportation." Dkt. No. 111, at 18. Plaintiffs also allege
that—if the culverts and embankments at issue were related to
CSX's ability to provide transportation services—the movement
of passengers or property would have been affected by their
failure/deterioration and during construction related to their
replacement. Id. at 20. Notably, Plaintiffs' Complaint
explicitly states that the movement of passengers or property by
CSX was not stopped or interrupted during either of these
occurrences. Dkt. No. 94 ¶¶ 63, 65. Therefore, taking
Plaintiffs' allegations as true, Plaintiffs' state law claims do
not constitute "transportation" under the ICCTA.

Plaintiffs' Complaint expressly states that the embankment
and culverts are not related to CSX's transportation services.
Id. While CSX contends that the pre-suit demand letter

AO 72A
(Rev. 8/82)

contradicts Plaintiffs' Complaint, viewing the allegations in Plaintiffs' favor removes any alleged contradiction.

Taking Plaintiffs' allegations as true, Plaintiffs' state law claims do not constitute "transportation" under the ICCTA. Consequently, the ICCTA does not preempt those claims.  CSX's motion to dismiss these claims is **DENIED**.

D. Personal Liability of Individual Marshall Defendants

The Marshall Defendants submit that Counts 4 (nuisance), 5 (injunctive relief), 7 (Trespass), 8 (negligence), 9 (negligence per se), 12 (punitive damages), and 13 (attorney's fees) should be dismissed as to Defendants D.C. Lawrence, Joseph Marshall, and Donald Lawrence.  Dkt. No. 103-1, at 17-20. Specifically, these Defendants assert that the Complaint only contains factual allegations against them in their capacities as owners, managers, agents, or contact persons for Marshall Square, LLC.  Id. at 17-18.

In response, JCI contends that D.C. Lawrence is liable for the torts committed at the Marshall Square site due to its own acts and omissions at the site.  Dkt. No. 119, at 21-22.  JCI also contends that factual allegations related to these claims create a plausible inference that Defendants Joseph Marshall and

AO 72A
(Rev. 8/82)

Donald Lawrence personally participated in, directed, or ratified the acts and omissions giving rise to these claims. Id. at 19-20.

Plaintiffs' Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (2009) (citation omitted). Under Georgia law, an "officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor[e], and an officer of a corporation who takes no part in the commission of a tort committed by the corporation is not personally liable unless he specifically directed the particular act to be done or participated or cooperated therein." Jennings v. Smith, 487 S.E.2d 362, 363-64 (Ga. Ct. App. 1997) (citations omitted); see also Milk v. Total Pay & HR Solutions, Inc., 634 S.E.2d 208, 213 (Ga. Ct. App. 2006) ("An LLC member may be held individually liable if he or she personally participates or cooperates in a tort committed by the LLC or directs it to be done." (citations omitted)).

JCI's factual allegations create a basis for its state law claims against Defendants D.C. Lawrence, Joseph Marshall, and Donald Lawrence. Specifically, JCI alleged that Defendants Joseph Marshall and Donald Lawrence "personally participated in,

AO 72A
(Rev. 8/82)

directed, ratified, and/or exercised control over the acts and/or omissions creating the conditions at Marshall Square [PUD] that resulted in the impacts and damages to the [Golf Course] described herein." Dkt. No. 94 ¶¶ 110, 112. JCI also alleged that these Defendants were responsible for ensuring compliance with the CWA and failed to do so. Specifically, JCI alleged that both men were (1) responsible for the design, installation, and maintenance of Best Management Practices ("BMPs") on the site, (2) responsible for compliance with related laws, (3) apprised of BMP non-compliance, and (4) at least one of these men received a stop-work order related to work at Marshall Square PUD. Id. ¶¶ 109, 111. Furthermore, both Defendants had knowledge of how the alleged conduct continues to damage JCI's property, yet the allegedly unlawful activities persist. Id. ¶¶ 109-13. These allegations are sufficient to render JCI's claims against Defendants Joseph Marshall and Donald Lawrence plausible.

Moreover, D.C. Lawrence is ultimately jointly liable for actions taken by its officers who act in its name. See O.C.G.A. § 14-11-301 (defining powers, duties, and authority of LLC members and managers); cf. Alexander v. Hulsey Envtl. Servs., Inc., 702 S.E.2d 435, 438 (Ga. Ct. App. 2010) ("A corporation is

an artificial person and can only act through its directors, officers, agents, and servants.  The tortious officer, agent and the corporation for whom they are acting when the tort is committed can be sued in the same action jointly." (alterations omitted)).  Defendants Joseph Marshall and Donald Lawrence are agents and/or officers of D.C. Lawrence.  Dkt. No. 94 ¶¶ 109-13. Moreover, Joseph Marshall c/o D.C. Lawrence is listed as the owner of Marshall Square PUD on the allegedly deficient Storm Drainage Plan and Erosion and Sedimentation Pollution Control Plan.  Id. ¶¶ 100-01.  Thus, D.C. Lawrence is liable for actions taken by its officers, Joseph Marshall and Donald Lawrence. Consequently, Plaintiffs' allegations are sufficient to make JCI's claims against D.C. Lawrence plausible.

Plaintiffs' Complaint contains factual allegations sufficient to make JCI's state law tort claims plausible. Consequently, the Marshall Defendants' motion to dismiss Counts 4-5, 7-9, and 12-13 is **DENIED.**

## V.    CONCLUSION

For the reasons stated above, the Marshall Defendants' Motion to Dismiss is **DENIED** (Dkt. No. 103), and CSX's Motion to Dismiss is **DENIED.**  Dkt. No. 104.

AO 72A
(Rev. 8/82)

**SO ORDERED**, this 28th day of March, 2013.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)