# In the United States District Court
# for the Southern District of Georgia
# Augusta Division

JONES CREEK INVESTORS, LLC and
SAVANNAH RIVERKEEPER, INC.,

     Plaintiffs,

     v.

COLUMBIA COUNTY, GEORGIA, and
CSX TRANSPORTATION, INC.

     Defendants.

CV 111-174

## ORDER

Plaintiff Jones Creek Investors alleges that activities occurring upstream from its pond, Willow Lake, have inundated Willow Lake with sediment, which in turn causes the golf course it operates to become flooded with murky water every time it rains. While Jones Creek Investors initially brought suit against a drove of Defendants, only two remain: Defendants Columbia County, Georgia, and CSX Transportation, Inc. Plaintiff alleges that these two Defendants' upstream activities have caused significant damages to its property and business, and seeks relief under the Clean Water Act and certain state law claims. Plaintiff also alleges that Defendant Columbia County's lax enforcement of its municipal discharge permitting system

AO 72A
(Rev. 8/82)

contributed to its damages. Plaintiff Savannah Riverkeeper, who alleges that the damages extend beyond Willow Lake and into the Savannah River downstream, joins Plaintiff Jones Creek Investors in the latter CWA claim against Columbia County.

Both remaining Defendants have filed Motions for Summary Judgment, and these motions are ripe for adjudication. Dkt. no. 412 (Columbia County); Dkt. no. 415 (CSXT). Additionally, Plaintiff Jones Creek Investors has filed Rule 72(a) Objections to the Magistrate Judge's October 29, 2014 Order granting in part Defendants' request to exclude new expert testimony proffered by Plaintiffs in the midst of summary judgment briefing and after the close of discovery. Dkt. no. 468.

For the reasons stated below, Plaintiff's Rule 72(a) Objections are **OVERRULED**. Defendant CSXT's Motion for Summary Judgment (Dkt. no. 415) is **GRANTED** in its entirety. Defendant Columbia County's Motion for Summary Judgment (Dkt. no. 412) is **GRANTED** as to the Clean Water Act claims (Counts 1-3), and the Court directs Plaintiff JCI and Defendant Columbia County to file supplemental briefing in regards to Counts 10, 11, and 13 against Columbia County.

## FACTUAL BACKGROUND

In Columbia County, Georgia, a small tributary begins at former Defendant Marshall Square's Planned Unit Development property. This tributary, "S1," flows approximately 1.7 miles

southeast through private property and a culvert beneath Defendant CSXT's rail line. About 300 feet upstream from Plaintiff JCI's pond, known as Willow Lake, S1 merges with Jones Creek ("S2"). The combined channel ("S3") flows a bit further before meeting with another tributary, "S4." S4 then flows into Willow Lake, which was formed in 1985 by damming and impounding Jones Creek downstream from its confluence with S1 and S4. Dkt. no. 412-21 ("Robertson Report"), pp. 4-5. When released from the Willow Lake Dam, Jones Creek wends another 1.3 miles before joining the Savannah River.

**Plaintiffs Savannah Riverkeeper and Jones Creek Investors**

Plaintiff Savannah Riverkeeper is a membership organization that advocates for the water quality of the Savannah River. Bonitatibus Dep. 14:21-15:13.[1] Many of its members fish and boat on the Savannah River. See, e.g., Dkt. no. 434-19 ("Sancken Aff."), ¶ 4. The Riverkeeper entered this case solely to bring Clean Water Act claims against Defendant Columbia County, whose alleged failure to police its MS4 system, the Riverkeeper argues, has negatively impacted its members' use and enjoyment of the Savannah River. See Dkt. no. 434-21 ("Bonitatibus Aff."), ¶ 12.

---

[1] The Court is uncertain as to the correct spelling of Ms. Bonitatibus's name. In Plaintiffs' own filings, it is variously spelled "Bonatatibus" (Dkt. no. 434-21, ¶ 1); "Bontibatus" (Id. p. 5 (signature line)), and "Bonitatibus" (Dkt. no. 434 (Combined Statement of Disputed Material Facts), ¶ 5. For purposes of this Order, the Court will use the latter spelling.

Plaintiff Jones Creek Investors, LLC ("JCI") owns and operates the Jones Creek Golf Course. Willow Lake, which is approximately 6.3 acres at full pool, is both an aesthetic feature and a water hazard for the Golf Course. Willow Lake is also the primary water supply for the Golf Course's irrigation. Dkt. no. 434-3 ("Kimsey Report"), p. 2.

JCI purchased the Golf Course in 2008. A short time later, JCI began to notice increased storm water flows and deposits of sediment into Willow Lake. Dkt. no. 434-23 ("Mundy Aff."), ¶ 5. In fall of 2009, JCI also noticed that "even minor rain-events were resulting in significant impacts on Willow Lake and the Golf Course, including flooding of parts of the Golf Course." Id. Since 2010, even an average rainfall of one inch or more will cause flooding on holes 11 and 13 at the Golf Course. When the flooding subsides, mud, dirt, and sediment remain on the greens and the golf cart paths. Dkt. no. 434-55 ("Hemann Aff."), ¶ 12. JCI usually must close the "back nine" holes for a few days after a flood to let the mud dry so it may be cleaned off the course. Id. Obviously, this sediment-laden flooding makes the Golf Course unappealing for many of JCI's potential customers. Id. ¶ 13.

Part of the problem, JCI believes, is that Willow Lake has become so inundated with sediment over the years that its storage capacity is significantly diminished. See Dkt. no. 434-

83 ("Robertson Dep."), 134:3-9. While the development of the Jones Creek subdivision surrounding the Golf Course from 1986-2002 admittedly caused heavy sedimentation to accumulate in Willow Lake, JCI claims that those developers responsible for the sediment covered some or all of the costs of having Willow Lake dredged in 1996 and 2003. Since then, JCI alleges that Willow Lake has re-filled with sediment, and one of its experts estimates that 23,484 cubic yards of sediment had been deposited in Willow Lake as of April, 2010. Dkt. no. 415-14 ("Pruitt Report"), p. 14. Additionally, Willow Lake's reduced capacity requires JCI to rely on it less for irrigation during its peak irrigation needs in the summer. Dkt. no. 434-16 ("Mundy Dep."), 82:12-84:22. This rationing can impact the health of the Golf Course's grass. Id.

**Facts Concerning Columbia County**

Plaintiffs bring two theories of liability against Columbia County for its alleged contribution to the sedimentation. First, Plaintiffs allege that Columbia County, which was in charge of policing and enforcing the County's "MS4" discharge permitting system, effectively failed at that task in violation of the CWA (Count I, Compl. ¶¶ 195-230). The MS4 permitting system lies at the end of a regulatory labyrinth and is discussed in more detail below. Second, Plaintiff JCI alleges that Columbia County owned a parcel of land that contributed to downstream

sedimentation, and is thus responsible for not adequately preventing that parcel from discharging sediment and other pollutants into Willow Lake and Jones Creek's tributaries and other waters. (Counts II and III, Compl. ¶¶ 231-44; 245-58).

The land in question is a 26 acre tract (the "County Property") that Columbia County obtained in July 2010 from the former Marshall Square Defendants in a zoning dispute settlement. Plaintiffs' expert Dr. Pruitt affied that the County Property has virtually no vegetation to help prevent runoff, and that drainage patterns on the property in fact carry surface water runoff from the exposed soil areas into S1. Dkt. no. 434-4 ("Pruitt Aff."), ¶ 4. Additionally, the County Property lacks the appropriate Best Management Practices, or BMPs, to help prevent sediment discharges. Columbia County's own inspector admitted that he would have reported this failure on an inspection report. Dkt. no. 434-64 ("Eastman Dep."), 113:1-9.

**Facts Concerning the CSX Crossing**

CSXT maintains a rail line that crosses over S1. The rail line sits on an embankment, and S1 flows through a culvert built into the embankment.

This culvert used to be made of brick. In May 2009, a Columbia County employee observed that the downstream side of the brick culvert at the CSX crossing had failed and informed CSXT of the condition. Dkt. no. 434-57 ("Palmer Dep."), 41:21-

25; 43:2-3. When CSXT's inspector investigated the culvert, he noticed that the wooden floor in the culvert had rotted away, causing the downstream outlet to settle and the embankment to slough away. Dkt. no. 434-69 ("Granger Dep."), 20:21-24. Also, the roof of the culvert had collapsed, causing riprap to fall into the culvert. Id. 64:12-16.

To fix the culvert, CSXT obtained a "Nationwide permit" from the Army Corps of Engineers for the repair work. Dkt. no. 434-78 ("Adkins 30(b)(6) Dep."), 14:2-6. CSXT replaced the failed culvert with two tubular culverts 72 inches in diameter. Id. 41:18-21. Plaintiffs' experts allege that the selection and installation of these culverts caused S1 to gain too much velocity downstream of the crossing, in turn causing heavy flooding and embankment erosion that contributed to the sedimentation of S1 and its downstream waterways. See Dkt. no. 434-11 ("Supplemental Pruitt Report"). Additionally, the replacement project itself resulted in significant sediment discharges into S1.

During construction, CSXT issued a "slow order" that required trains passing over the embankment to slow down from the maximum allowable speed of 35 mph to either 10 or 25 mph. While the slow order slowed down the rail traffic, it did not interrupt it completely. Dkt. no. 434-75 ("Harmon Dep."), 25:20-25.

AO 72A
(Rev. 8/82)

**DISCUSSION**

**I.   A Preliminary Matter: Plaintiff's Rule 72(a) Objections to the Magistrate Judge's October 29, 2014 Order**

Plaintiff JCI has objected to the Magistrate Judge's October 29, 2014 Order (Dkt. no. 467) excluding certain evidence and testimonies. Dkt. no. 468. Particularly, Plaintiff objects to the Magistrate Judge's exclusion of Ray Mundy's testimony as it relates to damages, Andy Hinds's supplemental impact analysis, and Dr. Pruitt's updated sediment measurements in Willow Lake. An understanding of the reasoning and impact of the Magistrate Judge's October 29, 2014 Order will require a brief review of the relevant procedural background.

**a. Prior Orders and the Parties' Responses**

The Magistrate Judge issued an omnibus Order addressing several Daubert and related motions *in limine* on December 23, 2013. Dkt. no. 365. Relevant to the present motion, that Order excluded as unreliable all opinions by Dan Troutman, an expert in environmental remediation, whom Plaintiffs sought to call to provide testimony regarding the scope of work and related costs of remediating the streams and golf course, dredging Willow Lake, and repairing the sediment-clogged irrigation system. Id. at 38-50. Because Troutman's cost estimates were the foundation of Plaintiff JCI's damages case, the Magistrate Judge noted the resulting "Troutman gap" in the impact analysis and directed the

parties to "proceed forthwith to the summary judgment stage and address the timing and method of revising the analysis after the presiding District Judge decides the larger issues of whether the analysis is relevant and whether it improperly assumes a lengthier damages period than ante-litem law allows." Id. at 53-54. This Court, in a second Daubert Order affirming the Magistrate Judge's decisions, agreed with that approach and explained that, if the Court deemed the analysis relevant, "the Court will at least allow Plaintiffs to make easy modifications to the analysis that require, for example, the mere changing of sources for historical cost information from Mr. Troutman to the lay witness that was Mr. Troutman's source. Plaintiffs may proceed now with preparing a revised analysis, as requested." Dkt. no. 395, p. 3.

Two weeks after this Court issued the second Daubert Order, JCI supplemented its interrogatory responses by increasing the amounts claimed in multiple categories of damages. Inter. Resp. to County, Dkt. no. 420-1, p. 6. Relatedly, JCI later disclosed more than a dozen new witnesses and vendors whose testimony would support JCI's damages claim, Suppl. Init. Discs., Dkt. no. 420-2, p. 1; Inter. Resp. to CSXT, Dkt. no. 420-3, p. 1, and also produced new damages documents that included new remediation and repair estimates, JCI Disc. Letter, Dkt.

no. 420-4; Chadworks Est., Dkt. no. 420-5; Scott Est., Doc. no. 420-6.

Defendants moved to exclude the opinions of these newly identified witnesses in June 2014. Dkt. nos. 420, 422. Shortly thereafter, JCI served on Defense counsel a revised impact analysis by Andrew Hinds that incorporated some of the new cost estimates discussed above, along with a new estimate for dredging Willow Lake. Rev. Impact Analysis, Dkt. no. 425-1. JCI did not provide Defense counsel with any expert disclosures for the new experts in compliance with Rule 26(a)(2)(B). Instead, JCI has designated Ray Mundy, President of Jones Creek Golf Club, to testify as a surrogate regarding the cost estimates prepared by these new experts and as the source of some of the information found in Hinds's revised impact analysis. JCI claims that this designation shields the new experts from classification as expert witnesses. JCI also claims this practice is permissible under the business manager comments to Federal Rule of Evidence 701, but Defendants moved to have Mundy's testimony excluded.

Meanwhile, on May 30, 2014, Columbia County moved for summary judgment and argued with respect to the inverse condemnation and takings claims that JCI cannot prove a nuisance rising to the level of a taking of property because Dr. Pruitt only measured sediment in Willow Lake once in 2010. Dkt.

no. 413, pp. 41-42. Without additional measurements, Columbia
County argued, "one would have to speculate as to whether that
volume has changed or guess at the amount of any such
hypothetical change." Id. at 42.

However, exactly one month after Defendants pointed out
this potential evidentiary gap in Plaintiffs' inverse
condemnation and takings claims, Dr. Pruitt returned to the golf
course and remeasured the volume of sediment in Willow Lake. See
Pruitt Aff., Dkt. no. 429-10. Dr. Pruitt issued a report
detailing his new measurements, Dkt. no. 429-19 ("July 2014
Pruitt Report"), which Plaintiffs submitted in opposition to
Defendants' summary judgment motions. Defendants sought to have
this new report excluded as well.

### b. The Magistrate Judge's October 29, 2014 Order

Thus, in light of the prior Daubert Orders and Parties'
subsequent filings, there were several new evidentiary issues
for the Magistrate Judge to consider in his October Order. Among
those were Mundy's fitness to proffer aggregated expert
testimony as a lay witness under the auspices of Federal Rule of
Evidence 701, the admissibility of Hinds's revised impact
analysis, and the admissibility of Dr. Pruitt's second

measurement of the sediment in Willow Lake.[2] The Magistrate Judge granted Defendants' challenges to all three admissions.

First, the Magistrate Judge concluded that Plaintiff JCI's attempt to aggregate previously undisclosed expert testimony into one lay witness, Mundy, under Rule 701 was improper. The Magistrate Judge noted that the strategy "ignores the undisputed fact that Mr. Mundy did not prepare these estimates and relies entirely upon others for their calculation," including several of the contractors who provided estimates for remediation, repairs, and dredging Willow Lake. MJ Order 12. "Mr. Mundy parrots these estimates for the first time in an affidavit dated July 11, 2014. He never bothers to explain how the estimates were calculated or mention the people who actually calculated them based on their personal expertise and knowledge." Id. The Magistrate Judge did not accept JCI's arguments that JCI happened to contract with these experts for purely operational reasons "in the ordinary course of business, to prepare opinions of the same ilk just scrutinized and declared unreliable by the Court in the [prior] Daubert Orders. Based on the timing and substance of these new estimates, the Court [found] that JCI hired these vendors to replace the unreliable estimates in furtherance of this litigation rather than in the ordinary

---

[2] The Magistrate Judge's October Order considered other evidentiary matters as well, but Plaintiffs have not challenged his rulings on those points. See generally Dkt. no. 467.

AO 72A
(Rev. 8/82)

course of business." Id. The Magistrate Judge additionally concluded that the new estimates were based on specialized knowledge within the scope of Rule 702 to which Mundy could not testify, that designating Mundy to present these opinions inappropriately sidesteps the requirements for post-discovery presentation of evidence under Federal Rule of Civil Procedure 26(e), and that Mundy could not present the aggregated expert testimonies under Federal Rule of Evidence 701 via the business managers doctrine discussed in the advisory committee notes to Rule 701. Id. at 13-15.

Second, the Magistrate Judge concluded that Hinds's revised impact analysis did not simply remedy the "Troutman gap" by substituting sources of historic cost information, as the Court contemplated in the second Daubert Order, but was rather a wholesale reconstruction of JCI's damages case. The Magistrate Judge rejected JCI's argument that the revised impact analysis was actually a required supplementation under Rule 26(e), which allows for supplementation of expert reports only when necessary to correct material errors or omissions caused by inadvertence or the receipt of new information. Id. at 4-12; Fed. R. Civ. P. 26(e).

And finally, the Magistrate judge excluded Dr. Pruitt's second measurement of sediment in Willow Lake. The Magistrate Judge reasoned that despite JCI's argument that, yet again, this

supplementation was required under Rule 26(e) because the
sedimentation of Willow Lake was "ongoing," there was nothing
preventing Dr. Pruitt from taking the second measurement earlier
during discovery (and, notably, before Defendants pointed out
its absence in their motion for summary judgment). Furthermore,
the Magistrate Judge found that exclusion of the second
measurement was required under Rule 37(c)(1), which requires
evidence to be excluded if it is not properly provided pursuant
to Rule 26(a) or (e) unless the failure to provide the
information "was substantially justified or harmless."

Plaintiff has objected to all three of these conclusions.
Dkt. no. 468. Both Defendants have responded, Dkt. no. 472
(Columbia Count); Dkt. no. 474 (CSXT), to which JCI has replied,
Dkt. no. 476.

### c. Standard of Review

When a magistrate judge rules on a non-dispositive pretrial
discovery matter, parties may object to that ruling and seek
review from the presiding district judge under Federal Rule of
Civil Procedure 72(a). See Fed. R. Civ. P. 72(a). In reviewing
the magistrate judge's order, the district judge must "modify or
set aside any part of the order that is clearly erroneous or is
contrary to law." Id. The clearly erroneous or contrary to law
standard "is exceedingly deferential." Jackson v. Deen, CV 412-
139, 2013 WL 3991793, at *2 (S.D. Ga. Aug. 2, 2013) (citing

14

<u>Pigott v. Sanibel Dev., LLC</u>, CV 07-0083-WS-C, 2008 WL 2937804, at *5 (S.D. Ala. July 23, 2008)). "A ruling is clearly erroneous where either the magistrate judge abused his discretion or the district court, after reviewing the entirety of the record, is left with a definite and firm conviction that a mistake has been made." <u>Id.</u> (citations omitted). "A decision by the magistrate judge is contrary to law where it either fails to follow or missaplies the applicable law." <u>Id.</u> (citations omitted).

### d. Plaintiff's Objections

#### i. Mundy's Testimony Under Rule 701

The central issue raised by JCI's objection to the Magistrate Judge's conclusion that Mundy cannot offer certain damages testimony as a lay witness concerns the differences between Rules 701 and 702. Under Rule 701, a non-expert lay witness may offer an opinion that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Under Rule 702, a qualified expert may offer expert testimony that is based on scientific, technical, or specialized knowledge under certain circumstances. Fed. R. Evid. 702. However, a Rule 702 expert must be disclosed during discovery in accordance with Federal Rule of Civil Procedure 26(a)(2). Here, JCI did not

disclose Mundy or any of the contractors who provided the cost estimates to repair damages to the golf course as experts. However, JCI seeks to tender Mundy's testimony regarding these estimates as a Rule 701 witness because, as the advisory committee's comments to Rule 701's 2000 amendments note,

> most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

Fed. R. Evid. 701 advisory committee's note (2000 Amendments) (citations omitted).

JCI objects to the Magistrate Judge's conclusion that Mundy cannot offer testimony under Rule 701 regarding the remediation damages, and argues that this conclusion is contrary to law. The thrust of JCI's argument is that Mundy, as the golf course's general manager, has personal knowledge of and has participated in the courses' day-to-day business affairs, including the solicitation, formation, and receipt of the estimates in question. Thus, JCI argues, Mundy may testify under Rule 701 (as opposed to Rule 702) regarding the negative impacts the golf course has suffered and the cost estimates to fix these problems. Interestingly, JCI makes the convenient argument that Mundy is qualified under Rule 701 to testify as to the cost

estimates themselves, but that he is not qualified (and will not offer) any testimony regarding what exactly the cost estimates contemplate in terms of what needs to be done to fix the damage to the golf course. Dkt. no. 468, p. 12. Indeed, JCI admits that "there are certain types of solutions that require an expert to explain what the solution is [and] how it works." Id.

To support this argument, JCI relies in part on the Eleventh Circuit's decision in Tampa Bay Shipbuilding & Repair Co. v. Ceder Shipping Co., Ltd., 320 F.3d 1213 (11th Cir. 2003). In Tampa Bay, the court affirmed a trial court's conclusion that three officers of a shipbuilding company were competent to testify under Rule 701 as to the reasonableness of an amount billed to a customer for ship repairs. Id. at 1223. The court reasoned that the officers could testify that the billed amounts were reasonable because they directly participated in the repair project, prepared the original estimate for the work, and determined the final amount to bill themselves. Id.

Tampa Bay is clearly distinguishable from the present case—Mundy is not testifying regarding the reasonableness of an estimate that he himself produced based on his own personal knowledge and experience. Instead, he seeks to proffer as reasonable the estimates that third-party (and undisclosed) experts produced based on their own "scientific, technical, or other specialized knowledge." See Fed. R. Evid. 702(a). The

AO 72A
(Rev. 8/82)

Magistrate Judge drew attention to Tampa Bay's statement that subsection (c) of Rule 701, which prevents a lay witness from offering an opinion "based on scientific, technical, or other specialized knowledge within the scope of Rule 702" "was an attempt to 'eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" Tampa Bay, 320 F.3d at 1222 (quoting Fed. R. Evid. 701 advisory committee's note (2000 Amendments)).

The Magistrate Judge correctly concluded that the cost estimates and damages testimony JCI seeks to proffer through Mundy as a lay witness is actually expert testimony only admissible through Rule 702 because that testimony is not based on Mundy's day-to-day activities as general manager of the golf course. Rather, this particular damages testimony is based on the specialized knowledge of the various experts who generated the costs estimates. JCI did not disclose Mundy or any of these contractors as expert witnesses under Federal Rule of Civil Procedure 26(a)(2), and cannot now evade those requirements by aggregating various experts' testimonies under one professed lay witness.

### ii. Revised Impact Analysis

The Magistrate Judge concluded that Hinds's Revised Impact Analysis must be excluded for at least three reasons: First, the

AO 72A
(Rev. 8/82)

Court's prior <u>Daubert</u> Orders merely authorized JCI to substitute sources for historic cost information in order to fill the "Troutman gap," but JCI, through its Revised Impact Analysis, instead replaced the historic sources with newer sources who provided higher estimates for the repairs. Second, Federal Rule of Civil Procedure 26(e) does not permit supplementation to add points that could have been made in the original expert report or to otherwise shore up weaknesses or inadequacies, and there is no reason why the new assumptions and methodologies used in the second report could not have been adopted and disclosed in the first during the discovery period. Third, Rule 37(c) only allows supplemental information to be added to expert reports outside of Rule 26(e)'s procedures where the failure to follow Rule 26(e) "was substantially justified or harmless," and here it was neither.

JCI contends that these findings are clearly erroneous. JCI suggests that the Magistrate Judge misunderstands what it is trying to accomplish with the Revised Impact Analysis because JCI tried to kill two birds with one stone in the new report, which simultaneously relied on the same historical sources of information that Troutman had previously relied on (as permitted by the previous <u>Daubert</u> Orders) while also incorporating revised data provided by those sources pursuant to Rule 26(e). <u>See</u> Dkt. no. 468, p. 20.

AO 72A
(Rev. 8/82)

But even if the Revised Impact Analysis seeks to pair historic cost information with new, "supplemental" cost information, JCI has still failed to show that Rule 26(e) permits this supplementation. Even though the sedimentation may be ongoing, the Magistrate Judge correctly noted that the original Impact Analysis was nevertheless able to consider the future financial impact of the sedimentation. Thus, there was no reason why the new methodologies included in the revised impact analysis could not have been included in the original. The Magistrate Judge's conclusion on this point, then, is not clearly erroneous.

### iii. Dr. Pruitt's Second Sediment Measurements

JCI argues that the Magistrate Judge's conclusion that Dr. Pruitt's second sediment measurement, taken in July, 2014 after briefing on Defendants' motions for summary judgment had already begun, is clearly erroneous because Dr. Pruitt could not have obtained this measurement at an earlier time. Under JCI's theory, each measurement taken of an ongoing nuisance is unique and, therefore, an appropriate supplement to expert testimony under Rule 26(e)(2). Furthermore, JCI argues that it did not scurry to find new evidence of sedimentation in response to Columbia County's motion for summary judgment, but rather simply allowed Dr. Pruitt to update his report and measurements in anticipation of trial.

In its Objection, JCI argues that it was erroneous for the Magistrate Judge to assume that it produced Dr. Pruitt's second sedimentation measurement in response to Columbia County's motion for summary judgment because JCI had already produced other evidence of the ongoing nature of the sedimentation in the form of photographs and eyewitness testimony. However, while it is true that JCI has produced other observational evidence that sediment is entering Willow Lake, this observational evidence is not *measureable* evidence of sedimentation like that found in Dr. Pruitt's second report. More tellingly, the observational evidence may not, in fact, rebut Columbia County's argument on summary judgment (which was filed before Dr. Pruitt took his second set of measurements) that "whether there has been a *measurable* addition of sediment to Willow Lake, or in what amount, is wholly speculative and does not support a claim of damages." Dkt. no. 413, p. 42 (emphasis added); see also id. at 41 ("Moreover, to the extent that JCI alleges an ongoing taking of property, JCI has wholly failed to show that *any quantifiable* amount of sediment has either discharged from any Columbia County property or deposited itself into Willow Lake—let alone within the twelve months preceding the *ante litem* notice.") (emphasis added).

Thus, given the procedural setting of Dr. Pruitt's second sediment measurement, it was not clearly erroneous for the

AO 72A
(Rev. 8/82)

Magistrate Judge to conclude that the new report was an attempt to "avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report." MJ Order 18 (quoting Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008).

### e. Conclusion

Plaintiffs have failed to show in any of their three objections that the Magistrate Judge's conclusions in the October 2014 Order were clearly erroneous or contrary to law. Plaintiffs' Objections (Dkt. no. 472) are therefore **OVERRULED**, and the Court will proceed to the summary judgment analysis accordingly.

## II. Summary Judgment Standard

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving

AO 72A
(Rev. 8/82)

party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). However, where the nonmovant's own sworn testimony contradicts the more favorable testimony of another witness, the court must accept the nonmovant's version of the events. Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

## III. Non-CWA Claims against CSXT Transportation, Inc.

The Court will address Plaintiff JCI's CWA claims against CSXT together with its claims against Columbia County below. Here, the Court will address the state and non-CWA federal claims against Defendant CSXT.

### a. State Law Claims and ICCTA Preemption

CSXT argues that the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10101 et seq.,

expressly preempts JCI's state law tort claims. In its March 28, 2013 Order denying CSXT's motion to dismiss, this Court held that Plaintiffs' allegations in their Complaint ruled out any finding of preemption at that stage in litigation. Dkt. no. 228, pp. 48-51. With the benefit of discovery since that prior finding, along with subsequent and persuasive opinions from other district courts and the Surface Transportation Board, the Court holds that the ICCTA preempts Plaintiffs' state law claims against CSXT. These include the state tort law claims alleged in Counts 6-9, the claim of inverse condemnation under state law alleged in Count 10, the state law claim for punitive damages in Count 12, and the request for attorney's fees under state law found in Count 13. (JCI brings Counts 10 and 13 against Columbia County as well, and those claims are discussed below.)

In passing the ICCTA, Congress expressly preempted state law regulation of rail transportation. Congress granted the Surface Transportation Board ("STB") exclusive jurisdiction over rail transportation, rail carriers, and rail facilities. 49 U.S.C. § 10501(a)(2)(b). Specifically, the ICCTA provides the STB with exclusive jurisdiction over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State . . .

§ 10501(a)(2)(B). "Transportation" is defined as

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, *property*, facility, instrumentality, or *equipment of any kind related to the movement of passengers or property, or both, by rail*, regardless of ownership or an agreement concerning use . . .

§ 10102(9)(A) (emphasis added).

"Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation, . . . while permitting the continued application of laws having a more remote or incidental effect on rail transportation." Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001) (editorial marks removed). Courts often find themselves parsing specific claims against rail carriers to see if the state law giving rise to the claim effectively "governs" rail transportation. There are several such cases that the Court may look to for guidance. However, "[a]s the agency with authority delegated from Congress to implement the provisions of the [ICCTA], the STB is 'uniquely qualified to determine whether state law . . . should be preempted." CSX Transp., Inc. v. Ga. Pub. Serv. Com'n, 944 F. Supp. 1573, 1584 (N.D. Ga. 1996) (citing Medtronic, Inc. v.

_Lohr_, 518 U.S. 470, 496 (1996) (giving similar deference to the FDA's determination of the Medical Device Amendments' preemption of state law)). The Court will look first to a recent ruling from the STB regarding ICCTA preemption before considering how other courts have analyzed the question.

On October 31, 2014, the STB found that claims under Missouri state law seeking compensation from a railroad for flooding and property damaged allegedly caused by the improper design, construction, and maintenance of the rail line and support structures were preempted by the ICCTA. _Thomas Tubbs et al.—Petition for Declaratory Order_, S.T.B. No. FD 35792, 2014 WL 5508153, *1 (October 31, 2014) ("_Tubbs_"). In _Tubbs_, a rail line owned by BNSF Railway Company ran along an earthen embankment between the petitioners' 550 acres of farmland and the Missouri River. _Id._ The embankment served as a dam for occasional floodwaters from the Missouri River, and BNSF had recently raised the embankment and fortified the track structure by placing rock and riprap alongside the track in preparation for anticipated flooding. _Id._ Despite these efforts, floodwaters breached the embankment when the Missouri River flooded in the summer of 2011. _Id._ The petitioners alleged that the breach washed away the soil on their farm, and sought damages under state law for trespass, nuisance, negligence, inverse condemnation, and statutory trespass. _Id._ Petitioners' theory of

liability was that BNSF's negligent design, construction, and maintenance of its rail line caused their damages. Id. at *2.

The STB decided that the ICCTA preempted the petitioners' state law tort claims because the claims were "based on alleged harms stemming directly from the actions of a rail carrier, BNSF, in designing, constructing, and maintaining an active rail line—actions that clearly are part of 'transportation by rail carriers' and therefore subject to the Board's exclusive jurisdiction under § 10501(b)." Id. at *4. The STB reasoned that the petitioners' claims would work against the purpose of § 10501(b) preemption, which seeks to prevent "a patchwork of state and local regulation from unreasonably interfering with interstate commerce," because those claims would interfere "with the railroad's ability to uniformly design, construct, maintain, and repair its railroad line." Id. at *5.

The Board distinguished some federal cases where courts found that the ICCTA did not preempt the plaintiffs' claims. Particularly, the Tenth Circuit in Emerson v. Kansas City Southern Railway Co. had held that a railroad's decision to discard old wooden railroad ties into a drainage ditch was not related to the movement of passengers or property and therefore was not part of rail transportation under § 10102(9). 503 F.3d 1126, 1130-33 (10th Cir. 2007). As such, the plaintiffs' claims that the discarded ties blocked the flow of water and caused

flooding on their property were not preempted by the ICCTA. Id.
In Tubbs, the STB held that, unlike the situation in Emerson,
BNSF's actions were an integral part of rail transportation as
they involve the railroad's design, construction, and
maintenance of its lines. Tubbs, 2014 WL 5508153 at *5. In
contrast to Emerson, the Board found several instances where
federal courts had found that state law claims for damages
allegedly caused by a railroad's construction or design of its
facilities are preempted. See, e.g., Maynard v. CSX Transp.,
Inc., 360 F. Supp. 2d 836, 841-42 (E.D. Ky. 2004) (negligence
claims related to flooding allegedly caused by construction and
maintenance of tracks preempted); In re Katrina Canal Breaches
Consol. Litigation, CV No. 05-4182, 2009 WL 224072, at *5 (E.D.
La. 2009) (negligence claims related to flooding allegedly
caused by design and construction of the roadbeds and other
areas of track).

With the STB's own understanding of the reach of its
authority in mind, the Court will also consider other courts'
delineation of the border between preempted claims that seek to
"regulate transportation" and unpreempted claims that do not. In
the Eleventh Circuit, the Court of Appeals explained that
Congress, in enacting the ICCTA preemption provision, only
sought to displace "regulation, i.e., those state laws that may
reasonably be said to have the effect of 'managing' or

'governing' rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001) (editorial marks and citations omitted). In light of this understanding, the Eleventh Circuit held that the ICCTA did not preempt generally applicable zoning ordinances enforced against a private party leasing property from a railroad for non-rail transportation purposes. Id. Conversely, in a case factually analogous to this one, the United States District Court for the District of South Dakota held that claims for damages flowing from BNSF's allegedly negligent design and construction of a culvert running beneath a track were preempted because "[c]laims challenging a railroad facility's design or construction fall within the ICCTA's express preemption provision." Waubay Lake Farmers Ass'n v. BNSF Ry. Co., CV No. 12-4179, 2014 WL 4287086, at *6 (D.S.D. Aug. 28, 2014).

In light of these authorities, the question becomes: do JCI's claims seek to effectively "manage" or "govern" CSXT's rail transportation, or do they impose merely a "remote or incidental" effect on that transportation? Upon CSXT's prior motion to dismiss, this Court held that JCI's complaint could fairly be interpreted to allege claims that do not affect "transportation" under the ICCTA. Dkt. no. 228, p. 51. However,

discovery provided evidence in the record that clearly shows that the culvert in question is inextricably linked to rail transportation.

JCI's initial observation, as recorded in its Notice of Intent letter to CSXT (which the Court did not consider at the motion to dismiss stage), was that "[i]n June, 2010, we observed a significant dip in the railroad tracks at this crossing apparently due to the loss of supporting soils." Dkt. no. 94-1, p. 3. JCI's observation buttresses Sparks' affidavit testimony that "continued collapse of the culvert could have further undermined the embankment, which in turn would have undermined the track itself, causing a track misalignment which can result in a derailment." Sparks Aff., Dkt. no. 415-2, ¶ 13.[3] To respond to this risk, CSXT says it had to act quickly to replace the failed culvert. Rod McFate, the engineer who oversaw construction, says that "CSXT's swift response was motivated by a concern for maintaining the safety of the track and train traffic, and also out of concern for upstream and downstream landowners, all of which would have been affected by any

---

[3] JCI later retreated from this characterization of the dip in the rail line, and instead submits that "the dip in the track is simply a normal topographic change in elevation that has likely been present for decades." Dkt. no. 434, ¶ 38. Accepting JCI's convenient revision, though, will not create a dispute of material fact. Whether the erosion in the embankment actually caused a dip in the rails is not necessarily material—the material question is whether CSXT's replacement of the culvert directly affects rail transportation. As to that question, the fact that the rails had always had a dip will not rebut CSXT's evidence that it replaced the culvert out of concern for the integrity of the rail line.

catastrophic failure of the embankment." McFate Aff., Dkt. no. 415-3, ¶ 9. While the trains were still able to run across the track during the construction, CSXT had to issue a "slow order" slowing the trains down to 10 miles per hour for 143 days and to 25 miles per hour for an additional eight days. Id. at ¶ 15. McFate also testified that if CSXT were forced to "realign" the new culverts such that they no longer erode the bank downstream from the CSX crossing, as JCI is requesting, such a project would require more "slow orders" to protect the workers and the train traffic because "any modification to the culverts and embankment will require workers to be in close proximity to the track; and any work on the embankment could pose a threat to the track's structure." Id. at ¶ 16.

JCI makes several references to the record in arguing that the replacement of the culvert is not inextricably linked to the rail or, alternatively, that there are at least questions of material fact regarding this connection. All of JCI's claims are inapposite. First, JCI claims that there is a dispute of material fact over who discovered the failed culvert—CSXT employee Hank Harmon, as CSXT claims, Dkt. no. 415, p. 6, or Columbia County employee Jacques Palmer, as JCI claims, Dkt. no. 434, ¶ 23. But the question of who discovered the failed culvert is not material for the preemption analysis—the reason for replacing it is.

Second, JCI makes much of the fact that trains were still able to run during the construction of the new culverts, albeit at a lower speed. JCI argues that such minimal effect on "rail transportation" is too "incidental" to confer ICCTA preemption. However, this argument misconstrues the scope of ICCTA preemption which, as the STB and federal courts have held, is intended to include actions that "involve the railroad's design, construction, and maintenance of its lines." Tubbs, 2014 WL 5508153 at *5. The fact that CSXT did not have to re-route trains from this line when it installed the new culverts has no bearing on whether or not the installation involved "the railroad's design, construction, and maintenance of its lines." As CSXT has shown, it replaced the culvert precisely because failing to do so would result in further erosion of the embankment and, ultimately, risk the integrity of the track itself. Such a project is certainly inextricably intertwined with railway transportation.

In sum, replacing the failed culvert at the CSXT crossing was not some incidental or peripheral venture CSXT undertook that was unrelated to its railway transportation services. The replacement was an integral and necessary repair to the railway infrastructure. Any state tort claims against CSXT for damages resulting from this construction to its infrastructure effectively govern CSXT's ability to keep its rail lines in

safe, working order. As such, JCI's state law claims against CSXT stemming from the failure, construction, design, and operation of the culverts are preempted by the ICCTA. CSXT's motion for summary judgment is **GRANTED** as to Counts 6, 7, 8, 9, 10, 12, and 13.

### b. Federal Takings Claims

JCI claims that the flooding and accumulation of sediment afflicting its property as a result of CSXT's replacement of the failed culvert amounts to a taking under the Fifth Amendment, pursuant to the Fourteenth Amendment. Plaintiff brings this inverse condemnation claim through 42 U.S.C. § 1983.

A § 1983 claim has two elements: "(1) conduct committed by a person acting under color of state law; and (2) that conduct deprived a person of rights, privileges, or immunities secured by the Constitution of the United States." Bus. Realty Inv. Co. v. Insituform Techs., Inc., 564 F. App'x 954, 956 (11th Cir. 2014). Where, as here, a plaintiff seeks to bring an inverse condemnation claim against a private party, the first inquiry is whether the private party can be said to have acted under color of state law, and the second is whether the conduct the plaintiff complains of amounts to an unconstitutional taking of private property. Because JCI has failed to show that CSXT was acting under color of state law when it replaced its culvert,

AO 72A
(Rev. 8/82)

the Court's analysis begins and ends with the state action inquiry.

"Only in rare circumstances can a private party be viewed as a state actor for section 1983 purposes." Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001). The Eleventh Circuit has held that for a court to hold that private parties are State actors for § 1983 purposes, courts must first conclude that one of the following three conditions is met:

> (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) "the State had so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise" ("nexus/joint action test").

Id. (editorial marks removed) (quoting NBC, Inc. v. Comms. Workers of Am., 860 F.2d 1022, 1026-27 (11th Cir. 1988). Here, JCI claims that CSXT is a state actor under the nexus/joint action test. Dkt. no. 461, p. 11 (citing the nexus/joint action test as enumerated in Warren v. Gov't Nat. Mortg. Ass'n, 611 F.2d 1229, 1232 (11th Cir. 1980)).

Under the nexus/joint action test, the Court must ask "whether the state has so far insinuated itself into a position of interdependence with the private parties that it was a participant in the enterprise. To charge a private party with

state action under this standard, the governmental body and private party must be intertwined in a symbiotic relationship." Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1278 (11th Cir. 2003) (quoting Rayburn, 241 F.3d at 1348) (quotations and editorial marks omitted). This symbiotic relationship must involve "the specific conduct of which the plaintiff complains." Id.

Here, the "specific conduct" JCI complains of for its federal takings claim is that CSXT failed to maintain its 100 year old culvert, which eventually failed and caused eroded sediment to enter JCI's property. Additionally, when CSXT replaced the failed culvert, it did so in a way that altered the hydrologic dynamics of the stream running under the CSX crossing, causing even more sediment to erode from downstream embankments and deposit into Willow Lake.

JCI argues that CSXT is a state actor for purposes of this condemnation because (1) as a railroad, it has been granted the power to condemn property under Georgia Code section 46-8-121; and (2) per the Georgia Court of Appeals, the right of condemnation comes with the reciprocal exposure to inverse condemnation suits. See Foskey v. Vidalia City Sch., 574 S.E.2d 367, 371 (Ga. Ct. App. 2002) ("The exercise of eminent domain is a constitutional grant which requires a judicial proceeding in

AO 72A
(Rev. 8/82)

the form of a condemnation action to sue in superior court as well as the reciprocal to be sued for inverse condemnation.").

JCI's theory for CSXT's § 1983 liability does not satisfy the nexus/joint action test. Georgia Code section 46-8-121 does not grant railroads a power of condemnation coextensive with the State's, but merely grants access to Georgia's condemnation procedures only after the proposed condemnation is first approved by the Georgia Railroad Commission, which is itself a regulatory arm of the state of Georgia. Ga. Code Ann. § 46-8-121. JCI has failed to point to any evidence in the record or otherwise argue how CSXT's ability to request a right of condemnation from the state in some circumstances creates a "symbiotic relationship" between the state and CSXT as to the failure and installation of its culverts. For example, there is no evidence in the record that CSXT used its condemnation power to obtain the portion of its line crossing Stream S1. Indeed, aside from making the state's condemnation procedures available to CSXT (but only with the state's prior approval), the state of Georgia, as far as the record is concerned, had absolutely no involvement with CSXT's alleged failure to maintain the aging culvert or with its decision to replace it. Section 46-8-121 is simply too tenuous a connection to show that Georgia has "so far insinuated itself into a position of interdependence with [CSXT] that it was a participant" in the culvert's allegedly negligent

36

maintenance and replacement. See Focus on the Family, 344 F.3d at 1278.

Additionally, Foskey's statement that the power of condemnation comes with a reciprocal exposure to inverse condemnation suits does not support JCI's suggestion that a limited, statutory grant of that power gives rise to § 1983 liability in every colorable occurrence of inverse condemnation. Foskey was concerned with whether a certain public entity, a school district, had the status and capacity to enter Georgia state courts as a legal entity. Foskey, 574 S.E.2d at 371-72. Foskey's holding does not touch on federal civil rights claims, state action, or the nexus/joint action test. The Georgia Court of Appeals mentioned the power of condemnation by analogy only, and that discussion has no bearing on when or whether private entities become "state actors" for purposes of § 1983 under Eleventh Circuit's "nexus/joint action" test.

Thus, JCI has failed to meet its burden to show that CSXT was acting under color of state law when it committed the specific acts complained of in JCI's complaint. CSXT's motion for summary judgment is **GRANTED** as to Count 11.

## IV. The Clean Water Act Claims

Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity" of the waters of the United States. 33 U.S.C. § 1251(a). The CWA

AO 72A
(Rev. 8/82)

makes it illegal to introduce pollutants from any point source into the navigable waters of the United States without a permit. §§ 1311(a), 1342.

Section 301 is the "cornerstone" of the CWA. That section prohibits all discharges of any pollutant other than those that comply with specified provisions of the CWA. § 1311; Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs, 486 F.3d 638, 645 (9th Cir. 2007), rev'd and remanded sub nom. on other grounds by Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261 (2009). Section 402 of the CWA establishes the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1342. The NPDES requires a permit for any discharge of any pollutant from a point source into waters of the United States. Id. The NPDES also requires compliance with that permit. Id.

The Administrator of the Environmental Protection Agency ("EPA") has initial authority to issue NPDES permits. § 1342(a). However, the CWA allows each state to establish its own NPDES permit program if that program "meets the standards set forth in the Clean Water Act and is approved by the Administrator of the EPA." Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC, 548 F.3d 986, 989 (11th Cir. 2008) (citing 33 U.S.C. § 1342(b)).

An entity's failure to comply with the conditions of either the EPA- or state-issued NPDES permit subjects the entity to

civil, criminal, or administrative enforcement proceedings and sanctions. Id. (citing 33 U.S.C. § 1319). The EPA and the appropriate state authorities can enforce compliance with state-issued permits. Id. In certain circumstances, a private citizen can sue violators of EPA- or state-issued NPDES permits in what is known as a "citizen suit." Id.; 33 U.S.C. § 1365(a).

### a. Count I: Columbia County's Alleged Violation of the CWA by the Discharge of Pollutants From the Columbia County MS4 System

Plaintiffs JCI and Savannah Riverkeeper jointly bring a citizen suit against Colombia County for an alleged violation of the County's NPDES permit. As a preliminary matter, though, Columbia County argues that Savannah Riverkeeper does not have standing to bring this claim alongside JCI.

### i. Plaintiff Savannah Riverkeeper has Standing to Sue

To demonstrate standing, Plaintiff Savannah Riverkeeper has the burden to show (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Friends of the Earth, Inc. v. Laidlaw Environmental Servs., 528 U.S. 167, 180-81 (2000); Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, --- F.3d ----,

AO 72A
(Rev. 8/82)

No. 14-12357, 2015 WL 1285250, at *5 (11th Cir. Mar. 23, 2015).

Savannah Riverkeeper will have standing to sue on behalf of its members if its members would have standing to sue in their own right, the interests at stake are germane to Savannah Riverkeeper's purpose, and neither the claim asserted nor the relief requested requires the participation Savannah Riverkeeper's members in the lawsuit. Friends of the Earth, 528 U.S. at 181; Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 2015 WL 1285250 at *5. Savannah Riverkeeper has satisfied these requirements.

First, Savannah Riverkeeper has shown that its members have suffered an injury in fact. "Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1992)); see also Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 2015 WL 1285250 at *5. While mere "conclusory allegations" and "general averments" that one of an organization's members uses unspecified portions of a large tract of territory are insufficient to overcome a standing challenge at the summary judgment stage (Friends of the Earth, 528 U.S. at 183-84 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89

(1990)), affidavits and testimony asserting that a defendant's conduct and the members' concerns about that conduct directly affects those affiants' recreational, aesthetic, and economic interests will satisfy the injury in fact inquiry. Id.

Here, Savannah Riverkeeper has submitted affidavits and testimony from its officers and members showing that the sediment at the confluence of Jones Creek and the Savannah River has directly affected their interests in the rivers' water quality. Riverkeeper Tonya Bonatatibus affied that sediment deposited at the convergence of the rivers created a shallow channel and increased vegetation, making it hard to navigate a kayak on Jones Creek. Bonatatibus Aff., Dkt. no. 434-21, ¶ 4. Ms. Bonatatibus can no longer lead recreational and commercial kayaking tours on that part of the water. Id. at ¶¶ 3-4. Also, Savannah Riverkeeper member Dr. Ted Weatherred affied that the sediment is forming a delta at the confluence of the rivers, where his house is located, and that this sediment is having an impact on his use and enjoyment of the Savannah River and Jones Creek while also diminishing his enjoyment of the aesthetics of the waters and the surrounding natural setting of the rivers. Dr. Weatherred Aff., Dkt. no. 443 (SEALED), ¶¶ 3-7.

Second, Savannah Riverkeeper has satisfied the traceability element. To show traceability in a Clean Water Act case, "a plaintiff need not prove that their injury can be traced to

specific molecules of pollution emitted by the alleged polluter. It is enough that a plaintiff 'show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern." <u>Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs</u>, 2015 WL 1285250 at *6 (citing <u>Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.</u>, 204 F.3d 149, 161 (4th Cir. 2000) (en banc)). Savannah Riverkeeper has provided photographic and eyewitness evidence that sediment is coming from Columbia County's property, entering S1, flowing into Willow Lake, and ultimately flowing into the Savannah River. <u>See, e.g.,</u> Mundy Aff., Dkt. no. 434-23, ¶¶34, 47-50; Dkt. no. 434 ¶¶ 89-91.

Columbia County argues that Savannah Riverkeeper has not shown a "genuine nexus" between the sediment flowing from Columbia County's property and the sediment appearing in the Savannah River. However, the scientific certainty that Columbia County seeks is not necessary for purposes of establishing standing—all Savannah Riverkeeper must show is "'that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern," and this it has done. <u>See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs</u>, 2015 WL 1285250 at *6.

AO 72A
(Rev. 8/82)

Third, Savannah Riverkeeper's injury is redressable. Plaintiffs in this case seek injunctive relief and civil penalties pursuant to the CWA for Columbia County's alleged violations.

Finally, Savannah Riverkeeper, as an organization, has shown that it has standing to sue on behalf of its members, because some of its members have standing to sue in their own right and the purpose of the organization is to act as an advocate of water quality for the Savannah River. Bonitatibus Dep. 14:21-15:13.

### ii. Whether Plaintiffs May Recover Against Columbia County for its Allegedly Dilatory Efforts in Enforcing its MS4 Permitting System

Plaintiffs allege that Columbia County violated its MS4 permit by failing to implement and enforce "a SWMP designed to reduce the discharge of pollutants from the MS4 to the maximum extent practicable." Plaintiffs' theory is that the "maximum extent practicable" standard requires Columbia County to enforce the SWMP such that the discharge of pollutants is actually reduced to the maximum extent practicable. Dkt. no. 460, p. 4. It argues that Columbia County failed to adequately enforce the SWMP, and thus violated a term of its NPDES permit. Columbia County counters that the "maximum extent practicable" standard does not require it to enforce the SWMP such that pollutant discharges are actually reduced to the maximum extent

practicable. Rather, that standard only applies to the design of the SWMP it is tasked to enforce. Thus, while the SWMP must be "designed to reduce the discharge of pollutants from the MS4 to the maximum extent practicable," Columbia County argues that it has a measure of executive discretion in how it enforces the SWMP, and need not enforce it such that pollutant discharges are actually reduced to the "maximum extent practicable."

Thus, the Court's first inquiry in assessing Count I is whether the "maximum extent practicable" standard is an effluent standard and a condition of Columbia County's NPDES permit. The interpretation of NPDES permit terms is purely a question of law for the Court to decide. Am. Canoe Ass'n Inc. v. D.C. Water & Sewer Auth., 306 F. Supp. 2d 30, 41 (D.D.C. 2004). After determining the conditions of Columbia County's MS4 permit, the Court will determine if Plaintiffs have presented a material issue of fact to go before the jury.

To interpret the NPDES permit, the Court must adhere to the standard principles of contract law.

> NPDES permits are treated like any other contract. If the language of the permit, considered in light of the structure of the permit as a whole, "is plain and capable of legal construction, the language alone must determine the permit's meaning." If, however, the permit's language is ambiguous, we may turn to extrinsic evidence to interpret its terms.

Natural Res. Def. Council, Inc. v. City of Los Angeles, 725 F.3d 1194, 1204-05 (9th Cir. 2013) (citations omitted). In this case,

AO 72A
(Rev. 8/82)

both parties are apparently quite confident that their interpretation will carry the day, as neither party has submitted to this Court any argument as to the permit's plain meaning or, in the event of ambiguity, extrinsic evidence of its meaning. Fortunately, this Court is able to find that the permit's meaning is plain and capable of legal construction.

Columbia County had a General Georgia Small MS4 permit, GAG610000, which was in force at the time Plaintiffs served Columbia County with their Notice of Intent letter. Dkt. no. 313-1 (the "2007 MS4 Permit"). After that permit expired, it was renewed and some changes were made to the operative language at issue in Plaintiffs' claim that Columbia County failed to enforce the permit. Dkt. no. 429-70 (the "2012 MS4 Permit"). The 2007 permit, which was operative from December 7, 2007 to December 6, 2012, read:

> The permittee [i.e., Columbia County] shall develop, implement and enforce a Storm Water Management Program designed to reduce the discharge of pollutants from the small MS4 to the maximum extent practicable (MEP), in order to protect water quality and to satisfy the appropriate water quality requirements of the State Act.

2007 Permit 7. The 2012 permit, which began on December 6, 2012, and will be active until December 5, 2017, reads:

> The permittee [i.e., Columbia County] shall implement and enforce a SWMP designed to reduce the discharge of pollutants from the MS4 to the MEP [i.e., maximum extent practicable], in order to protect water quality

AO 72A
(Rev. 8/82)

and to satisfy the appropriate water quality
requirements of the State Act and Rules.

2012 Permit 6.

Plaintiffs argue that, despite the almost identical
language between these two provisions, the exclusion of the word
"develop" from the latter version shows that the permittee's
duty to "implement and enforce" the SWMP is separate and
distinct from the permittee's duty to "develop" a SWMP. This
construction, as far as it goes, may be true to the EPA's and
Georgia EPD's intent for small MS4 permits. However, this
construction does not support Plaintiffs' conclusion that the
language here requires Columbia County to "implement and
enforce" its SWMP such that pollutants must actually be reduced
to the "maximum extent practicable."[4] For example, Plaintiffs
argue that "[t]he MEP standard does not govern the creation of
the SWMP, that it must be implemented, or that it must be
enforced, but the level to which pollutants must be
reduced. . . . The question is thus a factual one, has the
County implemented or enforced its SWMP such that pollutants are
reduced to the MEP." Dkt. no. 460, p. 4.

Plaintiffs, though, are wrong. In the sentence "[t]he
permittee shall develop, implement and enforce a Storm Water

---

[4] The phrase "maximum extent practicable" is a term of art, and should not be
attributed the ordinary meaning usually applied to those words. The permits
define "maximum extent practicable" as "the technology-based discharge
standards and controls necessary for the reduction of pollutants discharged
from a [MS4]. See, e.g., 2012 Permit 43.

Management Program designed to reduce the discharge of pollutants from the small MS4 to the maximum extent practicable," the phrase "maximum extent practicable" plainly refers to the design of the SWMP. It does not refer to the efficacy of the SWMP's implementation or enforcement. Therefore, the permits clearly and unambiguously do not incorporate the MEP standard as an effluent standard that the County must actually satisfy. Rather, the permit only requires Columbia County to develop, implement, and enforce an MS4 system "designed to reduce the discharge of pollutants from the small MS4 to the maximum extent practicable."

And even if this permit condition were ambiguous, the most authoritative extrinsic evidence the Court could turn to in order to interpret the permit language would still rule out Plaintiffs' proffered meaning. 40 C.F.R. § 122.34 (entitled "As an operator of a regulated small MS4, what will my NPDES MS4 storm water permit require?" and referenced in both the 2007 and 2012 permits at issue here) states:

> Your NPDES MS4 permit will require at a minimum that you develop, implement, and enforce a storm water management program designed to reduce the discharge of pollutants from your MS4 to the maximum extent practicable (MEP), to protect water quality, and to satisfy the appropriate water quality requirements of the Clean Water Act. . . . Implementation of best management practices consistent with the provisions of the storm water management program required pursuant to this section and the provisions of the permit required pursuant to § 122.33 constitutes compliance

with the standard of reducing pollutants to the
"maximum extent practicable."

40 C.F.R. § 122.34(a). Even if Plaintiffs were correct that
Columbia County's permit requires it to actually reduce
pollutants to the maximum extent practicable, the EPA's
regulations state that this requirement is satisfied merely by
implementing the best management practices listed in the MS4
permit. Whether those BMPs *actually* reduce pollutants in the
stormwater is immaterial.

This is not to say, of course, that Columbia County is not
required under the permit to implement and enforce its SWMP.
Implementation and enforcement are plainly conditions of the
permit. Compare 2007 Permit 7 ("The permittee shall develop,
implement and enforce a [SWMP] . . .") and 2012 Permit 6 ("The
permittee shall implement and enforce a SWMP . . .") with
Citizens for Pa.'s Future v. Pittsburgh Water & Sewer Auth., 13
F. Supp. 3d 493, 500 (W.D. Penn. 2014) (declining to find a
requirement to enforce an ordinance implementing a municipal
SWMP where the MS4 permit only required the municipality to
"implement a stormwater management program," with no explicit
requirement to "enforce" the program). Thus, the Court now must
evaluate the evidence in the record to see if there is a
material issue of fact as to whether or not Columbia County
"implemented and enforced" the SWMP.

AO 72A
(Rev. 8/82)

Columbia County argues that it has implemented and enforced the SWMP requirements and best management practices listed in its MS4 permit. In fact, much of the evidence Columbia County relies on as proof of this implementation and enforcement comes straight out of Plaintiffs' Complaint. For example, in many of the allegations against non-municipal Defendants in this case (who have since been dismissed), Plaintiffs rely on Columbia County's sanctions or warning notices for BMP violations as evidence of the other Defendants' wrongdoing. See, e.g., Second Am. Compl., Dkt. no. 94, ¶ 45 (alleging that Defendant Bruce Lyons had received "Columbia County warning notices regarding BMP violations at the Townhomes."); ¶ 87 ("Inspections conducted by Columbia County have found violations of BMPs at Krystal River on numerous occasions . . ."); ¶ 105 ("A July 2006 stop work order was issued by Columbia County to Joseph Marshall c/o D.C. Lawrence LLC [the operator of former Defendant Marshall Square]."); ¶ 107 ("Donald Lawrence received the results of the Marshall Square turbidity monitoring . . . and he received correspondence from Columbia County regarding BMP violations at Marshall Square."); ¶ 109 (Defendant Joseph Marshall "has been the recipient of at least one stop work order from Columbia County . . ."); ¶ 119 ("Inspections [of the Marshall Square development] conducted by Columbia County have found violations

of BMPs on numerous occasions starting on or around December 31, 2008 through at least March 2010.").

Additionally, in 2011, Columbia County's Building Standards Department conducted 1,198 erosion and sediment control ("E&SC") inspections (Dkt. no. 258-5, "Columbia County BOC Inspection Report," at pp. 24-49); 283 E&SC maintenance inspections (Id. at 8-23); and 133 E&SC reinspections (Id. at 3-6). These inspections led the Department to issue 131 failing reports (Id. at 48) and 214 curative action orders (Id. at 22 (recording 125 24-hour warnings, 2 "corrections required" warnings, 27 failing reports, 59 five-day warnings, and 1 stop work order.)). Columbia County's Engineering Services Department conducted another 784 site inspections leading to 10 stop work orders and 40 other corrective actions. Dkt. no. 258-4, "Engineering Services Inspection Report," pp. 12-28. The Building Standards Department also conducted 462 E&SC maintenance inspections, along with 64 scheduled inspections, and ordered some form of remedial action or issued a stop work order in at least 43 instances. Id. at 30-43, 3-11. The department also reviewed 104 development plans that year. Dkt. no. 258-3, p. 3.

These inspections, sanctions, and warnings seek to enforce Chapter 34, Article IV ("Stormwater Management") of Columbia

County's Municipal Code.[5] These code sections regulate the County's storm sewer system pursuant to Georgia regulations and the CWA. Columbia County Code § 34-144. The code specifically prohibits illicit discharges. § 34-148.

Plaintiffs argue that evidence in the record creates an issue of material fact as to whether Columbia County's efforts to enforce the provisions of its MS4 permit—from the enactment of ordinances prohibiting illicit discharges to the individual inspections and stop work orders—actually amount to "implementation and enforcement" of its SWMP. Plaintiffs offer several examples.

First, Plaintiffs point to evidence that Columbia County is approving erosion control plans that do not meet the minimum requirements of its sediment control ordinance. Plaintiffs' expert Glynn Groszmann has testified that, in his opinion, Columbia County approved site plans and issued permits to developers who had not met the minimum requirements for BMPs and E&SC enumerated in the County's own ordinances. For example, while Mr. Groszmann acknowledges that Columbia County "has been operating as a MS4, reviewing site plans, issuing land disturbing activity permits, inspecting sites, and receiving stormwater discharges from outfalls on numerous sites" (Dkt. no.

---

[5] Available at
https://www.municode.com/library/ga/columbia_county/codes/code_of_ordinances?nodeId=PTIICOOR_CH34EN.

434-104), he notes that some of the site plans Columbia County approved failed to satisfy the minimum requirements of the Georgia Manual for Erosion and Sediment Control (i.e., the "Green Book") (Dkt. no. 434-103, ¶ 5).[6] Other evidence of such violations include photographs of discolored water coming from the County's own property and nephelometric turbidity units (NTUs) readings from S1 in excess of Columbia County Ordinances' 25 NTU limit. See Dkt. no. 434, attachments 24-53 ("Mundy Photos"); Dkt. no. 434-14 (Pruitt Report discussing NTU reading results); Columbia County Code § 34-69(c)(1) (establishing turbidity limits).[7] These violations of the water quality criteria, Plaintiffs argue, show that Columbia County failed "to

---

[6] Mr. Groszmann, in his expert report (Dkt. no. 434-104), offers various opinions regarding Columbia County's SWMP enforcement. In addition to his opinion that the BMPs Columbia County enforced failed to meet the minimum requirements of the Green Book, he also concluded that this failure, along with others, results in Columbia County having "violated numerous requirements of the MS4 permit in its plan review, permitting, and inspection activities." The Magistrate Judge concluded that the former opinion is within the realm of Mr. Groszmann's expertise, while the latter is an improper legal conclusion. Dkt. no. 365, pp. 21-27. As such, the Court will consider Mr. Groszmann's opinion that plans Columbia County approved did not meet the Green Book requirements, but will disregard his conclusion that this failure violates the MS4 permit.

[7] The parties dispute whether discolored water, in and of itself, is actually a violation of the water quality criteria in the MS4 permit and, if it is, whether Plaintiffs have properly recorded the discoloration per the measurement standards listed in Ga. R. & Reg. § 391-3-6-.03(5)(d) ("All waters shall be free from turbidity which results in a substantial visual contrast in a water body due to a man-made activity. The upstream appearance of a body of water shall be as observed at a point immediately upstream of a turbidity-causing man-made activity. That upstream appearance shall be compared to a point which is located sufficiently downstream from the activity so as to provide an appropriate mixing zone."). Because the Court ultimately concludes that a possible violation of a permit for land-disturbing activities does not give rise to a citizen suit against Columbia County for issuing that permit in this case, the Court need not resolve this particular dispute.

implement to the maximum extent practicable." Dkt. no. 433, p. 31.

Second, Plaintiffs allege that Columbia County has failed to enforce its soil erosion, sedimentation, and pollution control ordinances by either failing to inspect some sites covered under the MS4 program or failing to consistently enforce the ordinances on those sites it does inspect. See generally Dkt. no. 434, ¶ 64. For example, Columbia County's own property (formerly part of the Marshall Square Development), which is an allegedly bare and unstable site not currently under construction, has never been inspected and the continuous discharges from that property have never been addressed. Additionally, for those sites Columbia County does address, Plaintiffs allege that Columbia County gives "months" of repeated five-day warnings for the same issue "or no warnings are issued even when violations are recorded." Dkt. no. 433, p. 33. These practices, Plaintiffs allege, "do not evidence acceptable implementation." Id.

But that phrase, "acceptable implementation," begs the question that ultimately ruptures Count 1: what *would* evidence acceptable implementation? And more importantly, if there is some standard by which a jury could measure Columbia County's degree of enforcement and implementation, is that standard clearly named in the MS4 permit, such that Columbia County knew

AO 72A
(Rev. 8/82)

the degree of underenforcement that would constitute a violation?

The only standard Plaintiffs have offered to answer the first question is the "maximum extent practicable" standard. But as the Court has already found, that is not a standard that governs the degree of implementation and enforcement, but rather governs the design goals of the SWMP. Thus, the only requirement Part II of the permit makes on Columbia County is to "implement" and "enforce" the SWMP—full stop.

The undisputed evidence in the record is that Columbia County *has* implemented and enforced its SWMP. Columbia County, in 2011 alone, conducted thousands of site inspections and issued hundreds of warnings and sanctions for violations of its sediment and erosion control ordinances, which it enacted to enforce the SWMP. Plaintiffs acknowledge as much, both through the expert Mr. Groszmann and through their allegations against prior Defendants in this case.

Granted, there is a factual dispute regarding the efficacy of Columbia County's implementation and enforcement. However, Plaintiffs failed to show how this dispute is material. Specifically, Plaintiffs have not established that implementing and enforcing the SWMP such that certain effluent standards are met is an explicit requirement under the permit.

Because its MS4 permit only requires Columbia County to "implement and enforce" its SWMP, and because the undisputed facts on the record are that it has implemented and enforced its SWMP to some degree, Columbia County has not violated its NPDES permit by failing to enforce the SWMP as a matter of law. Thus, there is no NPDES permit violation on which Plaintiffs may base Count 1, and Columbia County's motion for summary judgment on Count 1 is **GRANTED**.

### b. Counts II and III: Claims that Columbia County and CSXT Violated the CWA by Discharging Pollutants from Upstream Properties or by the Filling of Jurisdictional Waters and Wetlands

Plaintiff JCI brings Counts II and III for claims arising under the CWA against both Defendants Columbia County and CSXT. Specifically, Count II alleges that the Defendants violated 33 U.S.C. §§ 1311 and 1342 (§§ 301 and 402 of the CWA) for the unauthorized discharge of pollutants. Count III alleges that Defendants violated 33 U.S.C. §§ 1311 and 1344 (§§ 301 and 404 of the CWA) for the discharge or placement of fill in jurisdictional waters. For Defendant Columbia County, these discharges allegedly come from the unstable plot it received from former Defendant Marshall Square in a zoning dispute settlement. For Defendant CSXT, these discharges allegedly come from the failure and subsequent repair of the culvert through which S1 passes beneath the CSX rail crossing.

AO 72A
(Rev. 8/82)

"To establish a CWA violation, the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a NPDES permit." Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1008 (11th Cir. 2004). Because Plaintiff JCI has failed to show that the alleged discharges were into "waters of the United States," its CWA claims fail.

The CWA only prohibits the discharge of pollutants into "navigable waters." See 33 U.S.C. §§ 1311(a), 1362(12). "Navigable waters" are defined as "the waters of the United States, including the territorial seas." Id. at § 1362(7). The parties agree that the definition of "navigable waters" is a key element in Plaintiffs' CWA claims in this case, but they disagree as to whether Willow Lake, Jones Creek, and S1 meet the criteria of that definition.

In Rapanos v. United States, the Supreme Court issued a fractured opinion, with no majority holding, which sought to construe the statutory term "navigable waters." 547 U.S. 715 (2006). While the entire Supreme Court agreed that the term "navigable waters" includes waters beyond those traditionally considered "navigable-in-fact," Id. at 731 (plurality opinion); id. at 767 (Kennedy, J., concurring); id. at 792 (Stevens, J., dissenting), the Court split three ways as to the proper test for what constitutes "navigable waters."

The plurality held that wetlands are "navigable waters" for CWA purposes only when they (1) are adjacent to a "relatively permanent body of water connected to traditional interstate navigable waters"; and (2) have "a continuous surface connection with that water." Id. at 742 (plurality opinion). Concurring with the plurality, Justice Kennedy held that, at least for wetlands adjacent to nonnavigable tributaries, a "significant nexus" must exist "between the wetlands in question and navigable waters in the traditional sense" for those wetlands to fall under the bounds of the CWA. Id. at 779, 782 (Kennedy, J., concurring). The dissent would have applied a broader test, and suggested that CWA jurisdiction should be established if either the plurality's or Justice Kennedy's test is satisfied. Id. at 810 (Stevens, J., dissenting).

The Eleventh Circuit has adopted Justice Kennedy's "significant nexus" test as the governing definition of "navigable waters" under Rapanos. United States v. Robinson, 505 F.3d 1208, 1221-22 (11th Cir. 2007) (applying the Supreme Court's direction in Marks v. United States, 430 U.S. 188, 193 (1977), for lower courts to adopt the position taken by those Supreme Court Members "who concurred in the judgments on the narrowest grounds" as the holding of a fragmented Supreme Court decision). Thus, this Court will apply Justice Kennedy's "significant nexus" test to determine if there is a genuine

issue of material fact as to the "navigable waters" element of Plaintiffs' CWA Claims.[8]

A water or wetland satisfies the "significant nexus" test if, "either alone or in combination with similarly situated lands in the region, it significantly affects the chemical, physical, and biological integrity of other covered waters more readily understood as navigable." Id. at 1218 (quoting Rapanos, 547 U.S. at 780) (editorial marks omitted). "When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Id. "A mere hydrologic connection . . . may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." Id. (quoting Rapanos, 547 U.S. at 784-85).

Robinson concerned a district court's erroneous jury instruction regarding the definition of "navigable waters" in a criminal trial for charges brought under the CWA, and thus the

_____

[8] There appears to be a Circuit split as to whether the "navigable waters" inquiry is reserved for the Court or for the jury. Some Circuits treat the "navigable waters" inquiry as a question of law, rather than one of fact. Compare Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs, 633 F.3d 278, 289 (4th Cir. 2011) ("We . . . treat compliance with Justice Kennedy's 'significant nexus' test as a question of law, as we do with any question of statutory interpretation . . ."), with Robinson, 505 F.3d at 1224 n.21 ("We express no opinion as to whether [the creek at issue in Robinson] does or does not actually satisfy Justice Kennedy's test; that is a question for the jury in the first instance."). Given the Eleventh Circuit's pronouncement in Robinson, the Court in this case will examine the evidence in the record to determine if, when construed in a light most favorable to Plaintiffs, the evidence could support a jury determination that the waters at issue here are "navigable waters" per Justice Kennedy's "significant nexus" test.

Eleventh Circuit did not elaborate on what kind of evidence would satisfy the "significant nexus" test. However, Justice Kennedy offered some examples of indicia of a "significant nexus." For example, courts may look to a "measure of the significance of the connection for downstream water quality" or "evidence about the significance of the tributaries to which the wetlands are connected." Rapanos, 547 U.S. at 784 (Kennedy, J., concurring).

Other courts have elaborated on these indicia. The Sixth Circuit, applying the significant nexus test in United States v. Cundiff, 555 F.3d 200 (6th Cir. 2009), held that expert testimony that the wetlands in question "perform significant ecological functions in relation to the [navigable] Green River" could show that the wetland had a significant nexus to navigable waters. Id. at 210-11. Particularly, the expert in Cundiff testified that the wetlands provided temporary and long-term water storage, filtered acid runoff and sediment from a nearby mine, and provided an important habitat for plants and wildlife. Id. at 211. Furthermore, the lower court had found that the ditches the defendants dug on their property, along with other activities, had "undermined the wetlands' ability to store water which, in turn, [had] affected the frequency and extent of flooding, and increased the flood peaks in the Green River. Thus, it [had] impacted navigation, crop production in

bottomlands, downstream bank erosion, and sedimentation." Id. at
211 (alterations and quotations omitted). These activities also
had "direct and significant impacts to navigation" on the Green
River and to aquatic food webs that could not thrive in acidic
and sediment-choked environments. Id. Finally, the Sixth Circuit
held that such findings need not be based on quantitative
laboratory analyses to support a finding of a significant nexus
between the wetlands and navigable-in-fact waters, but rather
could be based on qualitative physical evidence. Id.

The Fourth Circuit in Precon Development Corporation, Inc.
v. U.S. Army Corps of Engineers, 633 F.3d 278 (4th Cir. 2011),
agreed that the significant nexus test does not require
laboratory tests or any particular quantitative measurements.
Id. at 294.[9] Precon did hold, though, that the significant nexus
test requires some evidence of both a nexus and its
significance. Id. Without evidence of "significance," it would
be impossible to distinguish "significant" effects from merely
"speculative or insubstantial" effects. Id. (quoting Rapanos,
547 U.S. at 780 (Kennedy, J., concurring)). For example, Precon
held that evidence of wetlands' water storage capacity and
potential flow rates "support a conclusion that certain amounts

---

[9] While other Circuits' opinions are not binding on this Court, they may be
looked to as persuasive authority when not in conflict with Eleventh Circuit
holdings. See Roe v. Michelin N. Am., Inc., 613 F.3d 1058, 1062 (considering
other Circuits' decisions as persuasive authority when the Eleventh Circuit's
own precedent is "relatively sparse"). To this end, the Fourth Circuit's
holdings are particularly helpful, as they govern the opposite bank of the
Savannah River and its eastern watershed.

AO 72A
(Rev. 8/82)

of water, sediment, and pollutants migrate, or are prevented from migrating from these wetlands to the [navigable] Northwest River, and thus establish that a 'nexus' [was present in that case]. But they do not speak to the *significance* of this nexus." Id. at 295 n.14 (emphasis in original). Unlike the evidence available in Cundiff, which included expert testimony regarding the waters in question "*in relation to*" the navigable river, the evidence in Precon that the wetlands and their adjacent tributaries trap sediment and nitrogen and perform flood control functions was not sufficient to show a "significant" nexus because, from that evidence, the court did not "even know if the Northwest River suffer[ed] from high levels of nitrogen or sedimentation, or if it is ever prone to flooding." Id. at 295. The court found that cases where a "significant nexus" was shown "included some evidence not only of the functions of the relevant wetlands and their adjacent tributaries, but of the condition of the relevant navigable waters." Id. at 296.

Thus, the question on summary judgment as it relates to whether Jones Creek, Willow Lake, and their tributaries are covered by the CWA becomes: is the evidence on record before the Court, viewed in a light most favorable to JCI, sufficient to support a jury determination that those waters have a significant nexus on navigable-in-fact waters?

AO 72A
(Rev. 8/82)

There is a slew of evidence in the record that clearly does not support a finding that Jones Creek, S1, and Willow Lake are "navigable waters" despite JCI's assertions to the contrary. First, while JCI claims that Jones Creek and Willow Lake are navigable-in-fact themselves (and thus do not require a showing of a "significant nexus" to waters that are navigable-in-fact), there is no evidence of this in the record aside from some statements that people use Jones Creek and Willow Lake recreationally. Recreational use, though, is not enough to make a body of water "navigable in fact" as that term is traditionally understood. Neither do Columbia County's and the Army Corps of Engineer's prior determinations that Willow Lake, Jones Creek, and S1 "may" be waters of the United States within CWA jurisdiction resolve this factual determination. Executive agencies' findings that bodies of water "may" be covered by the CWA do not bind this Court to hold that they actually are, as a matter of law.[10]

Plaintiffs seek to counter that evidence by offering the expert testimony and observations of Drs. Wear and Pruitt. Dr.

---

[10] Conversely, neither would JCI's admitted practice of discharging stormwater contaminated with sediment and other pollutants into Willow Lake without a permit serve as some sort of admission that Willow Lake *is not* a jurisdictional water under the CWA. See Dkt. no. 412-13, "Mundy Dep.", 287:1-22 (admitting that, to Mr. Mundy's knowledge, JCI has no permit to discharge pollutants into Willow Lake), 231:24-232:2 (admitting that JCI's stormwater may contain pollutants), 287:23-288:11 (admitting that JCI discharges sediment). The significant nexus test turns on a waterway's connection and impact on navigable waters, not on individuals', businesses', or agencies' treatment or labelling of the waterway.

Wear, a biologist and professor at Georgia Regents University, provided JCI with expert opinions that (1) excessive sedimentation in the Jones Creek watershed fostered greater than normal concentrations of *E. Coli*; (2) excessive sedimentation in a watershed may generally effect the food supply, spawning habitat, and wading bird feeding habits in the Jones Creek watershed; (3) such excessive sedimentation has, in fact, changed the feeding habits and population of large wading birds in Jones Creek; (4) sediment from sources upstream of Willow Lake has reached the Jones Creek confluence with the Savannah River and caused adverse impacts to the ecology. See generally Dkt. nos. 256-1, Wear Expert Report; 256-2, Wear Suppl. Report. This evidence, particularly Dr. Wear's opinions that sediment from sources upstream of Willow Lake has had adverse impacts on the ecology in the Savannah River (opinions (3) and (4)) is exactly the kind of evidence discussed in Precon and Cundiff that shows both the functions of the upstream tributaries and their adverse impact on navigable waters. However, the Magistrate Judge determined, and this Court affirmed, that Dr. Wear lacked a sufficient factual basis to testify either that excessive sedimentation has had ecological impacts on Jones Creek or that sediment upstream from Willow Lake has made its way into the Savannah River and caused an adverse impact to the ecology. See Dkt. nos. 365, MJ Order, pp. 32-35; 395, Order

Overruling Objs. to MJ Order, pp. 5-6. The Magistrate Judge
ruled that "[s]ince there is no basis for concluding that
excessive sedimentation from the Willow Lake tributaries has
impacted areas downstream of Willow Lake, Dr. Wear's testimony
regarding ecological impacts of sedimentation should be limited
in scope to Willow Lake and its tributaries." Dkt. no. 365,
p. 35. Furthermore, this Court subsequently concluded that Dr.
Pruitt's "mere recognition that sediment passes through Willow
Lake— notwithstanding any specific amount" is "too thin a reed
upon which Dr. Wear can erect an opinion regarding the effects
of excessive sedimentation downstream of Willow Lake." Dkt. no.
395, pp. 5-6.

After the Daubert Orders, all that is left of Dr. Wear's
opinion, as it relates to Willow Lake and its upstream
tributaries' impact on navigable waters, is that excessive
sedimentation coming from S1 is having an ecological impact on
Willow Lake and its tributaries (which have not themselves been
shown to be navigable waters for purposes of the CWA). See MJ
October 29, 2014 Order 15-17 (prohibiting Dr. Wear "from
testifying regarding the existence and effect of excessive
sedimentation in areas downstream of willow lake" but allowing
her to discuss, generally, the harmful impacts of excessive
sedimentation). To this, we can add Dr. Wear's and others'

AO 72A
(Rev. 8/82)

observation of a sandbar where the Jones Creek and Savannah River converge. Id. at ¶ 3(b).

This evidence is not sufficient to create a material issue of fact as to whether Willow Lake and its tributaries have a significant nexus to navigable waters. Unlike the witnesses in Cundiff, who testified both to the wetlands' functions in relation to the Green River *and* to the effect the damage to the wetlands was having on the ecology and navigability of the Green River, Cundiff, 555 F.3d at 211, the evidence in the record here fails to show any significant impact that the sedimentation and ecological changes in Willow Lake and its tributaries are having on the Savannah River. While there is evidence that a sandbar has formed at the confluence of the Savannah River and Jones Creek, the Magistrate Judge ruled that there is not sufficient evidence to establish that the sandbar is actually *caused* by sediment coming from Willow Lake and its tributaries.[11] Furthermore, even if there were evidence that sedimentation in Willow Lake and its tributaries was forming the sandbar, there is no evidence of the significance of the impact this sandbar is

[11] This finding does not contradict the Court's early reliance on this sandbar in finding that Plaintiff Savannah Riverkeeper had standing to bring a CWA suit on behalf of its members. See Part IV.a.i. *supra*. The traceability element of a standing analysis only requires that plaintiffs "show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 2015 WL 1285250 at *6. Because a plaintiff need not show a "significant nexus" between the discharge and the injury, there is a lighter evidentiary burden for establishing standing than there is for establishing a wetland's "significant nexus" to jurisdictional waters.

having on "the chemical, physical, and biological integrity" of the Savannah River. It could very well be that sandbars are a common occurrence on the Savannah River and do not have any deleterious effect on the River's quality. In short, there is no evidence to establish what caused the sandbar nor is there evidence establishing whether the sandbar is or is not having a significant effect on "the chemical, physical, and biological integrity" of the Savannah River. See Robinson, 505 F.3d at 1218.

Instead, the evidence in this case is comparable to that in Precon, where the evidence supported the conclusion that a certain amount of water, sediment, and pollutants escaped the wetlands and flowed into the Northwest River, thus establishing a "nexus," but failed to show the *significance* of that nexus. Here, the observations of sediment-laden water flowing from Willow Lake into Jones Creek establishes a nexus between Willow Lake, Jones Creek, and the Savannah River, but neither the ecological state of Willow Lake and its tributaries nor the fact of a sandbar at the confluence of Jones Creek and the Savannah River offer any evidence of the *significance* of that nexus.

JCI has failed to provide evidence from which a reasonable jury could find a significant nexus between Willow Lake and its tributaries and the navigable Savannah River. It has thus failed to establish, as a matter of law, that Willow Lake and its

tributaries are "navigable waters" under the Jurisdiction of the CWA, an essential element of its CWA claims. Counts 2 and 3 against all Defendants, therefore, fail, and Defendants' motions for summary judgment on these counts are **GRANTED**.[12]

## V.   JCI's Damages Case Against Columbia County

What began as a case alleging 13 counts against 14 separate Defendants now has only one Defendant, Columbia County, and three separate Counts, 10, 11, and 13, remaining. Counts 10, 11, and 13 form Plaintiff JCI's damages claim against Columbia County. Count 10 alleges an inverse condemnation claim against Columbia County. Count 11 alleges, alternatively, a taking under 42 U.S.C. § 1983 and/or the United States Constitution against Columbia County. Finally, Count 13 alleges attorney's fees under Georgia Code section 13-6-11 against all Defendants.

Throughout the summary judgment briefing, neither party had the benefit of this Order and its decision to uphold the Magistrate Judge's October 29, 2014 Order. Because The Magistrate Judge's Order undermines much of Plaintiff JCI's damages case as it was presented in its revised impact analysis and summary judgment pleadings, it would be premature for the Court to rule on Columbia County's Motion for Summary Judgment

---

[12] If the Eleventh Circuit were to determine that the "significant nexus" inquiry is actually a question of law, this Court would decide that Plaintiffs have failed to produce any evidence showing that there is a significant nexus between Willow Lake, its tributaries, and navigable waters as a matter of law.

AO 72A
(Rev. 8/82)

on these three remaining Counts. This case is well into its third year of litigation—the Parties and the Court have invested too much time and effort into this case for it to be resolved on anything less than a full and proper consideration of Plaintiff's admissible damages case.

Thus, Plaintiff JCI is directed to file within 20 days a revised impact analysis and a brief addressing Defendant's arguments for summary judgment on Counts 10, 11, and 13, supported by evidence that has been admitted by this Court's prior Orders. To be clear, this is not an opportunity for Plaintiff to bring any new evidence to the table. Instead, Plaintiff may offer evidence consistent with this Court's March 31, 2014 Order inviting Plaintiff to "make easy modifications to the analysis that require, for example, the mere changing of sources for historical cost information from Mr. Troutman to the lay witness that was Mr. Troutman's source." Dkt. no. 395, p. 3. Plaintiff shall not include in this analysis or its briefing any evidence based on reports or information provided by any witness or expert who has not already been disclosed to Defendants or who was not a source of information for Mr. Troutman. This direction is not an invitation for Plaintiff to rebuild its damages case from scratch, but rather an invitation to recast the damages case with the remaining evidence in the record that has not been excluded by this Court's prior Orders.

Defendant will have 20 days to respond. The Court has considered Defendant's request to dismiss without prejudice the remaining state law claims for lack of supplemental jurisdiction pursuant to 28 U.S.C. § 1367. That request is denied. Because this litigation has proceeded for so long in federal court, the burden of restarting litigation in state court is too great for the Court not to exercise its discretion in retaining the case.

### CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment as to the Clean Water Act claims (Counts I, II, and III) are **GRANTED**. Summary judgment is also **GRANTED** as to all other claims brought against Defendant CSXT (Counts 6-13). The Court has directed Defendant Columbia County and Plaintiff JCI to file supplemental briefs in regards to Counts 10, 11, and 13 against Columbia County.

**SO ORDERED**, this 31ST day of March, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)